**Slip Op. 10-47**

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| _____ : | |
| MID CONTINENT NAIL CORPORATION, : | |
| DAVIS WIRE CORPORATION, MAZE NAILS : | |
| (DIVISION OF W.H. MAZE COMPANY) and : | |
| TREASURE COAST FASTENERS, INC., : | |
| : | |
| Plaintiffs, : | |
| v. : | Before: Jane A. Restani, Chief Judge |
| : | |
| UNITED STATES, : | Court No. 08-00224 |
| : | |
| Defendant. : | **Public Version** |
| _____ : | |

## OPINION

[Plaintiffs' motion for judgment on the agency record in targeted dumping case is denied and judgment is entered for the defendant.]

Dated: May 4, 2010

Wiley Rein, LLP (Adam Henry Gordon and Maureen Elizabeth Thorson) for the plaintiffs.

Tony West, Assistant Attorney General; Jeanne E. Davidson, Director, Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (David F. D'Alessandris); Office of Chief Counsel for Import Administration, U.S. Department of Commerce (William G. Isasi, Hardeep K. Josan and Brian Soiset), of counsel, for the defendant.

Restani, Chief Judge: This court action challenges the Department of Commerce's

("Commerce") final determination rendered in a targeted antidumping duty investigation of

certain steel nails from the United Arab Emirates ("UAE"). See Certain Steel Nails from the

United Arab Emirates: Notice of Final Determination of Sales at Not Less Than Fair Value, 73

Fed. Reg. 33,985 (Dep't Commerce June 16, 2008) ("Final Determination"). The plaintiffs, Mid

Continent Nail Corporation, Davis Wire Corporation, Maze Nails and Treasure Coast Fasteners, Inc., collectively the domestic industry, submitted a motion for judgment on the agency record. For the reasons stated below, the court denies the plaintiffs' motion and grants judgment on the agency record in favor of the United States.

## BACKGROUND

### I.      Targeted Dumping

Targeted dumping analysis is "an alternative method for determining the existence of margins of dumping in an investigation . . . ." Targeted Dumping in Antidumping Investigations; Request for Comment, 72 Fed. Reg. 60,651, 60,651 (Dep't Commerce Oct. 25, 2007) ("Request for Comment").  The purpose of this methodology is to enable Commerce to identify dumping when a seller is providing lower prices to only certain United States purchasers "by comparing the weighted average of the normal values to the export prices (or constructed export prices) of individual transactions for comparable merchandise."  19 U.S.C. § 1677f-1(d)(1)(B); see Request for Comment.  By contrast, during an ordinary antidumping investigation, Commerce determines "whether the subject merchandise is being sold in the United States at less than fair value . . . by comparing the weighted average of the normal values to the weighted average of the export prices (and constructed export prices) for comparable merchandise" or by "comparing the normal values of individual transactions to the export prices (or constructed export prices) of individual transactions for comparable merchandise."  19 U.S.C. § 1677f-1(d)(1)(A).

### II.     Commerce's Investigation of Certain Steel Nails from the UAE

In May 2007, the plaintiffs filed petitions with Commerce concerning certain steel nails from the UAE. Certain Steel Nails from the People's Republic of China and the United Arab Emirates: Initiation of Antidumping Duty Investigations, 72 Fed. Reg. 38,816, 38,817 (Dep't Commerce July 16, 2007). In July 2007, Commerce initiated a targeted dumping investigation of certain steel nails from the UAE for the period of April 1, 2006, through March 31, 2007. Id. In August 2007, Commerce selected Dubai Wire FZE ("DW"), "the largest producer/exporter of nails from the UAE," as the mandatory respondent in the investigation. Certain Steel Nails From the United Arab Emirates: Notice of Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination, 73 Fed. Reg. 3945, 3945 (Dep't Commerce Jan. 23, 2008) ("Preliminary Determination"). In October 2007, the plaintiffs submitted an allegation of targeted dumping against DW. Id.

In its Preliminary Determination, published on January 23, 2008, Commerce used the methodology it had accepted in a previous investigation to conclude that targeted dumping had occurred at an antidumping duty (AD) margin of 4.47%.[1] Id. at 3950. At that time, however, Commerce stated that it intended to develop a new methodology to assess DW's alleged targeted dumping and requested comments on the matter. Id. at 3947.

On April 21, 2008, Commerce informed the plaintiffs of its new methodology

---

[1] The P/2 test provides "that where the weighted-average net price to an alleged targeted purchaser or region is more than 2 percent lower than the weight-average net price to non-targeted purchasers or regions in [merchandise]/month combinations representing a preponderance of the targeted quantity, a 'pattern' of 'significant' price differences" exists. Issues and Decision Memorandum for the Final Determination of the Less-Than-Fair-Value Investigation of Coated Free Sheet Paper from the Republic of Korea, A-580-856, POR 10/01/05-09/30/06, at 3–4 (Oct. 17, 2007), available at http://ia.ita.doc.gov/frn/summary/KOREA-SOUTH/E7-21035-1.pdf (last visited Apr. 29, 2010).

("the nails test") and set a sixteen day deadline for comments.[2]  (Pls.' Confidential App. in Supp.

of Pls.' Rule 56.2 Mot. for J. Upon the Agency R. ("Pls.' App.") Tab 10 at 7–9.)  The nails test

consists of two stages.  Proposed Methodology for Identifying and Analyzing Targeted Dumping

in Antidumping Investigations; Request for Comment, 73 Fed. Reg. 26,371, 26,372 (Dep't

Commerce May 9, 2008) ("Proposed Methodology").  The first stage, the "standard deviation

test," requires Commerce to calculate a standard deviation for all of the sale prices of an item

from a particular exporter.  Id.  Commerce then must add together the volume for all of the items

sold at a price below one standard deviation from the weighted-average price.  Issues and

Decision Memorandum at 19.  If this combined volume exceeds thirty-three percent of the total

volume of sales of that item from the particular exporter, the first stage of the test is satisfied.  Id.

The second stage of the test, the gap test, is satisfied if the volume of sales that qualify under a

price gap comparison[3] exceeds five percent "of the total [volume] of sales of subject merchandise

---

[2] The plaintiffs point out that they were afforded only fourteen days to comment because Commerce made clarifications on April 24, 2008.  See Issues and Decision Memorandum for the Final Determination in the Less-Than-Fair-Value Investigation of Certain Steel Nails from the United Arab Emirates (UAE), A-520-802, at 4 (June 6, 2008) ("Issues and Decision Memorandum"), available at http://ia.ita.doc.gov/frn/summary/UAE/E8-13490-1.pdf (last visited Apr. 29, 2010).

[3] To perform a price gap comparison, Commerce must:

[D]etermine the total [volume] for which the difference between (i) the sales-weighted average price to the allegedly targeted customer and (ii) the next higher sales-weighted average price to a non-targeted customer exceeds the average price gap (weighted by sales value) for the non-targeted group. Each of the price gaps in the non-targeted group would be weighted by the combined sales associated with the pair of prices to non-targeted customers that make up the gap.

Proposed Methodology, 73 Fed. Reg. at 26,372, amended by Issues and Decision Memorandum

(continued...)

to the allegedly targeted customer." Proposed Methodology, 73 Fed. Reg. at 26,372, amended by Issues and Decision Memorandum at 20 n.6.

The plaintiffs filed their case brief in response to the nails test on May 7, 2008. (See Pls.' App. Tab 13.) On May 9, 2008, Commerce published the nails test and provided the public thirty days to comment. Proposed Methodology, 73 Fed. Reg. at 26,372. Commerce subsequently extended this deadline until June 23, 2008. Antidumping Methodologies for Proceedings that Involve Significant Cost Changes Throughout the Period of Investigation (POI)/ Period of Review (POR) that May Require Using Shorter Cost Averaging Periods; Request for Comment and Proposed Methodology for Identifying and Analyzing Targeted Dumping in Antidumping Investigations; Request for Comment, 73 Fed. Reg. 32,557, 32,557 (Dep't Commerce June 9, 2008). On June 16, 2008, however, Commerce published its Final Determination, which adopted the nails test, and used it to calculate a dumping margin of zero. Final Determination, 73 Fed. Reg. at 33,988. In addition, Commerce determined that it had properly calculated DW's financial expense rate without including the financial expenses of Global Fasteners Ltd. ("GF"), an entity that Commerce had previously collapsed with DW. Issues and Decision Memorandum at 28–30. Finally, Commerce also allowed a revised scrap offset that included the sale price of extraneous materials that were not the by-product of nail production. Id. at 30–31.

In August 2008, the plaintiffs filed a complaint contesting the Final Determination. In February 2009, the plaintiffs filed a motion for judgment on the agency record

---

[3](...continued)
at 20 n.6.

pursuant to USCIT Rule 56.2.

## STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c).  The court will uphold

Commerce's final determinations in AD investigations unless they are "unsupported by

substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C.

§ 1516a(b)(1)(B)(i).

## DISCUSSION

**I.       Reasonable Time under 19 U.S.C. § 1677m(g)**

The plaintiffs allege that Commerce's actions deprived them of their due process

rights under the Fifth Amendment. (Pls.' Mem. of Law in Supp. of Pls.' Rule 56.2 Mot. for J.

Upon the Agency R. ("Pls.' Mem.") 16.)  The plaintiffs claim that by providing the domestic

industry only sixteen days to comment on the nails test, Commerce did not afford enough time to

submit meaningful comments to demonstrate all of the nails test's errors.  (See Id. at 17–24.)  In

support of their position that the comment period was unreasonable, the plaintiffs cite the facts

that Commerce needed "several months" to develop the nails test, that Commerce typically

affords parties fifty days to comment on preliminary determinations,[4] and that Commerce

provided the public over thirty days to comment.  (Id.)  This claim lacks merit.

Congress has provided a fair process for commenting within the statutory

language of 19 U.S.C. § 1677m.  See 19 U.S.C. § 1677m(g).  Subsection (g) provides that:

---

[4] Under 19 C.F.R. § 351.309(c)(1)(i), any interested party for a final determination in an antidumping investigation, may submit a case brief "50 days after the date of publication of the preliminary determination or results of review . . . unless the Secretary alters the time limit."  19 C.F.R. § 351.309(c)(1)(i).

> Information that is submitted on a timely basis to the administering authority or the Commission during the course of a proceeding under this subtitle shall be subject to comment by other parties to the proceeding within such reasonable time as the administering authority or the Commission shall provide. The administering authority and the Commission, before making a final determination . . . shall cease collecting information and shall provide the parties with a final opportunity to comment on the information obtained by the administering authority or the Commission . . . upon which the parties have not previously had an opportunity to comment. Comments containing new factual information shall be disregarded.

19 U.S.C. § 1677m(g). Whether or not a constitutional due process right exists in these circumstances is an issue that need not be decided here because such a right would not require any more time to be afforded to the plaintiffs than is already required by statute. If Commerce provides a time period for comments that is unreasonable, it would be in violation of the statute. Compare 19 U.S.C. § 1677m(g), with Borden Inc. v. United States, 23 CIT 372, 375 n.3 (1999), rev'd on other grounds, 7 F. App'x 938, 938–39 (2001) (holding that "[t]he court applies a rule of reason in evaluating administrative due process claims"). Accordingly, the court considers the plaintiffs due process argument as a claim that Commerce violated the statutory due process requirement of 19 U.S.C. § 1677m(g).

Generally, "[w]here a right to be heard exists, due process requires that right be accommodated at a meaningful time and in a meaningful manner." Barnhart v. United States Treasury Dep't, 588 F. Supp. 1432, 1438 (CIT 1984). Recognizing that "[w]ith more time most parties could improve the quality of their comments," courts ask whether there is "evidence that given more time [a plaintiff] would have, in fact, provided more meaningful comments." Sichuan Changhong Electric Co. v. United States, 466 F. Supp. 2d 1323, 1328 (CIT 2006). If, however, a plaintiff makes thoughtful comments that Commerce addresses in its determination,

then, "as a practical matter, [the plaintiff] was not substantially deprived of an opportunity to be heard before the agency." Borden, 23 CIT at 375 n.3. This understanding has previously led the court to conclude that a comment period as brief as four days can be reasonable. See Sichuan, 466 F. Supp. 2d at 1329.

Despite having a full opportunity to demonstrate that the comment period was unreasonable by presenting the court with additional critiques of the nails test that they were not previously afforded the opportunity to develop, the plaintiffs have failed to provide any new and convincing arguments. Although the plaintiffs filed a thorough case brief, the court notes that most of their arguments are similar, if not identical, to the ones raised at the administrative level. (Compare Pls.' App. Tab 13, with Pls.' Mem.) The plaintiffs claim that they would have made many additional arguments if they were afforded more time to comment, yet now provide only one such example. (Pls.' Mem. 22.) They argue that the mean price was incorrectly used to calculate the standard deviation. (Id.) The plaintiffs contend that if the statistically correct median price were used, Commerce might have found dumping in this case. (Id.) Contrary to the plaintiffs claim, however, the use of a mean to calculate a standard deviation is, by definition, a perfectly acceptable statistical method. Christine Ammer & Dean S. Ammer, Dictionary of Business and Economics 397 (1977). Although median can be substituted for mean in certain situations, such a substitution is not required. See generally Yulia Gel, Weiwen Miao & Joseph L. Gastwirth, The Importance of Checking the Assumptions Underlying Statistical Analysis: Graphical Methods for Assessing Normality, 46 Jurimetrics J. 3, 26 (2005). In addition, such claims are merely speculative—the plaintiffs do not offer any numerical evidence to support their

contention that using a median would yield a different result.[5]

There is no evidence before the court, therefore, to suggest that the plaintiffs would have provided more meaningful comments if they were afforded additional time to comment. Accordingly, the court holds that Commerce afforded the plaintiffs a reasonable time to comment under 19 U.S.C. § 1677m(g).

## II.     The Nails Test

The plaintiffs challenge the Final Determination on the grounds that the nails test violates 19 U.S.C. § 1677f-1(d)(B) and 19 C.F.R. § 351.414(f)(1)(i) and therefore, Commerce's conclusion is not supported by substantial evidence. Specifically, the plaintiffs argue that in investigating their claim of targeted dumping, Commerce improperly considered only identical products, used a statistically invalid methodology, and unreasonably defined terms. (Pls.' Mem. 24–25.) This claim lacks merit.

Under 19 U.S.C. § 1677f-1(d)(1)(B), which essentially defines the targeted dumping remedy, Commerce "may determine whether the subject merchandise is being sold in the United States at less than fair value by comparing the weighted average of the normal values to the export prices (or constructed export prices) of individual transactions for comparable merchandise," but only if "there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time."

---

[5] Furthermore, the plaintiffs have failed to establish that it would have been futile to seek additional time for comment. The plaintiffs stated at oral argument that although no formal request was made, informal conversations with Commerce indicated that a request would be denied. Given the lack of a record on this, and in the context of this case there is no reason to presume what Commerce would have done in the face of a formal request.

19 U.S.C. § 1677f-1(d)(B).  In addition, 19 C.F.R. § 351.414(f)(1)(i) provided that Commerce

must use "standard and appropriate statistical techniques" when determining whether sales

qualify for this section.  19 C.F.R. § 351.414(f)(1)(i).[6]

        Generally, courts lack an "independent authority to tell the [agency] how to do its

job" when a statute does not specify "any Congressionally mandated procedure or methodology

for assessment of the statutory tests."   U.S. Steel Group v. United States, 96 F.3d 1352, 1362

(Fed. Cir. 1996).  This silence has been interpreted as "an invitation" for an agency administering

unfair trade law to "perform its duties in the way it believes most suitable" and courts will

uphold these decisions "[s]o long as the [agency]'s analysis does not violate any statute and is not

otherwise arbitrary and capricious."  Id.

A.     **Commerce's decision to consider only identical products is supported by substantial evidence.**

        The plaintiffs first claim that Commerce's decision to test only identical products

was in violation of the clear language of 19 U.S.C. § 1677f-1(d)(B), which instructs Commerce

to consider "comparable merchandise."  (Reply Br. of Mid Continent Nail Corp., Davis Wire

Corp., Maze Nails and Treasure Coast Fasteners, Inc. 7.)  Identical merchandise is comparable

merchandise.  See 19 U.S.C. § 1677(16).  In some cases it may be a smaller subset of all

comparable merchandise.  Id.[7]  In a case such as this, however, where the great bulk of the

_____

[6]Commerce withdrew 19 C.F.R. § 351.414(f) on December 10, 2008.  Withdrawal of the Regulatory Provisions Governing Targeted Dumping in Antidumping Duty Investigations ("Revocation"), 73 Fed. Reg 74,930, 74,932 (Dep't Commerce, Dec. 10, 2008).  At the time of the Final Determination, however, this regulation was effective.

[7] If Commerce must use other comparable merchandise to compare to U.S. sales, it must

(continued...)

allegedly targeted sales had identical matches, the statutory language does not require Commerce

to do more.[8]  (Def.'s Supp. Br. and Confidential App. 2.)  Based on this record, the court

concludes that Commerce's decision to consider only identical merchandise was supported by

substantial evidence and was in accordance with law.

> **B.      Commerce's use of standard deviation is statistically valid.**

The plaintiffs claim that Commerce's use of standard deviation in the nails test is

unreasonable because "[a] standard deviation is simply a descriptive measure of a population; in

other words, standard deviation measures <u>describe</u> the dispersion of data, and then <u>calculate</u> how

spread out prices are from the average price." (Pls.' Mem. 26.)  The plaintiffs go on to claim that

"[a]t the most basic level, then, the Department's starting point violated the regulatory

requirement that it use a 'standard and appropriate' statistical technique to determine whether

targeting was occurring" because, contrary to Commerce's assertion, "the standard deviation

cannot validly be used as a method to calculate a 'relative measure.'" (<u>Id.</u>)

Generally, a standard deviation is defined as "a measure of the tendency of

individual values to differ from the mean." Christine Ammer & Dean S. Ammer, <u>Dictionary of

Business and Economics</u> 397 (1977).  "The standard deviation is the most common measure of

---

[7](...continued)
make adjustments to get close to a price which may be compared.  19 U.S.C.
§ 1677b(a)(6)(C)(ii); 19 C.F.R. § 351.411.  These adjustments provide an opportunity for the
introduction of inaccuracies into the process.

[8] In fact, [[              ]] percent of the allegedly targeted sales had identical matches.
(Def.'s Supp. Br. and Confidential App. 2.)

dispersion," which is "the total spread of the values in a frequency distribution." Id. at 122. In statistics, a frequency distribution is "the organization of data to show how often certain values or ranges of values occur." Id. at 170.

As previously described, the nails test uses standard deviation to measure the dispersion of values in an exporter's price data, to aid in identifying which of the exporter's sales were relatively low compared to others.[9] See Proposed Methodology, 73 Fed. Reg. at 26,372. After the dispersion is identified, the nails test requires Commerce to use the thirty-three percent test to determine whether a "pattern" existed under the statute. Id. Thus, contrary to the plaintiffs' assertions, Commerce's use of standard deviation was, by definition, statistically valid because it was used to measure the dispersion of the sales prices.[10] This aspect of the nails test, therefore, is not in violation of 19 U.S.C. § 1677f-1(d)(B)(i).

**C.      The nails test's definitions of "pattern" and "differ significantly" do not violate 19 U.S.C. § 1677f-1(d)(B)(i).**

---

[9] The plaintiffs also contend that Commerce's reliance on the word "low" is ultra vires because it is not used within the statute. (Pls.' Mem. 27.) Although the plaintiffs are correct that the word "low" does not appear within the language of 19 U.S.C. § 1677f-1(d)(B), Commerce explains that this interpretation "strikes a balance between two extremes, the first being where any price below the average price is sufficient to distinguish the alleged target from others . . . and the second being where only prices at the very bottom of the price distribution are sufficient to distinguish the alleged target from others." Issues and Decision Memorandum at 16.

[10] Based on the evidence, the court is not convinced that the P/2 test is an inherently better test. The P/2 test, which draws a hard line at two-percent, is arguably only well suited for a particular type of market. Hypothetically, if the prices of the market greatly varied, most prices are likely to satisfy the two-percent requirement and this test may capture too many sales. Alternatively, if the prices were nearly uniform, few sales would satisfy the two-percent threshold and the test may not capture enough. In contrast, a standard deviation can be calculated for all types of dispersions and therefore, provides Commerce with a consistent method to analyze all markets.

The plaintiffs further challenge Commerce's definitions of "pattern" and "differ significantly" as arbitrary, unexplained, and unreasonable. (Pls.' Mem. 26.) Particularly, the plaintiffs claim that Commerce's use of thirty-three percent in its "pattern" definition and five percent in its "differ significantly" definition are seemingly random values with no meaning. (Id. at 36–38.) The plaintiffs contend that, in this case, these unreasonable definitions cause the nails test to overlook obvious targeting.[11] (Id. at 24–25.) This claim lacks merit.

As previously discussed, Commerce included a thirty-three percent threshold requirement in its definition of "pattern." Issues and Decision Memorandum at 19. Commerce explained that it considered thirty-three percent reasonable for establishing a pattern of activity. Id. The court has no reason to disagree.

Commerce defined "differ significantly" as any situation when the five percent price gap test is satisfied. Id. at 20–21. Commerce stated that it considered a five percent difference as significant, when used in combination with the thirty-three percent threshold, under the statutory language. Id. at 21. Although these tests may create a standard that is more difficult

---

[11] The plaintiffs spend several pages in their brief detailing hypothetical data sets in an attempt to illustrate this point and thus, expose Commerce's test as unreasonable. (See Pls. Mem. 30–34.) The plaintiffs argue that these examples clearly illustrate "targeted dumping" under 19 U.S.C. § 1677f-1(d)(B)(i), but would not be classified as such under Commerce's test. (Id.) The plaintiffs further contend that much like these examples, the facts of this case clearly support a finding of targeted dumping and that any finding otherwise cannot be supported by substantial evidence. (Id. at 38–39.) The plaintiffs' examples, however, are unconvincing because they oversimplify a market. Each example contains only a few hypothetical prices spread out at a great variance, creating a market where all of the extremely low prices fall within one standard deviation of the average price. (See id. at 30–34.) Such a result occurs because the hypothetical markets also contain extremely high prices that offset the low ones. (See Id.) The price variation of these markets are unrealistic, and therefore, raise few practical concerns regarding this methodology.

to satisfy than the domestic industry would have preferred, the nails test "does not violate any statute and is not otherwise arbitrary and capricious." U.S. Steel Group, 96 F.3d at 1362. In other AD contexts, and for a long period of time five percent tests have been used to measure significance for AD purposes. See, e.g., 19 U.S.C. § 1677b(a)(1)(C) (1994) (using five percent test to determine home market viability); id. § 1677b(a)(1)(B)(ii)(II) (1994) (using five percent test to determine third-country market viability); 19 C.F.R. § 351.403(d) (1998) (using five percent test to determine whether to "calculate normal value based on the sale by an affiliated party"). Furthermore, plaintiff has done nothing to attempt to establish that on this record the five percent requirement is unreasonably high. The various aspects of the nails test do not violate the statutory language of 19 U.S.C. § 1677f-1(d)(1)(B)(i) and are applied reasonably based on this record.[12]

### III.   Withdrawal of the Regulatory Provisions Governing Targeted Dumping in Antidumping Duty Investigations ("Revocation"), 73 Fed. Reg 74,930 (Dep't Commerce, Dec. 10, 2008).

In December 2008, Commerce issued an "interim final rule for the purpose of withdrawing the regulatory provisions governing the targeted dumping analysis in antidumping duty investigations." Revocation, 73 Fed. Reg. at 74,930. Commerce explained that it "may have established thresholds or other criteria that have prevented the use of this comparison

---

[12] The plaintiffs also contend that Commerce's test masks targeted dumping because it improperly averages all sales, both allegedly targeted and non-targeted to calculate the average-mean price. (Pls.' Mem. 28.) The plaintiffs claim that this practice is "distorting or biasing the comparison to a finding that targeting does not exist." (Id. at 28–29.) While including the alleged targeted sales in the average-mean calculation could lower the mean, excluding such sales could lead to the opposite result, perhaps raising the mean too high and increasing the chance that an otherwise non-targeted sale be classified as targeted. An inclusion of these prices, therefore, is no less reasonable than the exclusion that the plaintiffs desire.

methodology to unmask dumping, contrary to the Congressional intent.  In that case, these

provisions would act to deny relief to domestic industries suffering material injury from unfairly

traded imports." Id. at 74,931.  The plaintiffs now cite these statements as evidence to support

their arguments that given more time they could have provided more meaningful comments and

that the nails test violates 19 U.S.C. § 1677f-1(d)(B).

Contrary to this proposition, courts have made it clear that unreasonableness cannot be

inferred from a subsequent withdrawal.   See FCC v. Fox Television Stations, Inc., 129 S. Ct.

1800, 1811 (2009) (holding that an agency "need not demonstrate to a court's satisfaction that the

reasons for the new policy are better than the reasons for the old one; it suffices that the new

policy is permissible under the statute, that there are good reasons for it, and that the agency

believes it to be better, which the conscious change of course adequately indicates"); GPX Int'l

Tire Corp. v. United States, 645 F. Supp. 2d 1231, 1238 (CIT 2009) (holding that "[i]f the

statutes are ambiguous, it does not matter whether Commerce's new interpretation of the statutes

conflicts with its old interpretation, because the court is now looking at Commerce's new

interpretation and will give that interpretation deference if it is reasonable").

Furthermore, in the Revocation, Commerce stated that it "believes the withdrawal

of this rule is not significant. Withdrawal will allow the Department to exercise the discretion

intended by the statute and, thereby, develop a practice that will allow interested parties to pursue

all statutory avenues of relief in this area." Revocation, 73 Fed. Reg. at 74,931.  Commerce also

provided that it "is not replacing these provisions with new provisions. Instead, the Department is

returning to a case-by-case adjudication, until additional experience allows the Department to

gain a greater understanding of the issue." Id.  By its very terms, therefore, the Revocation is not

an admission by Commerce that the nails test is unlawful—it merely demonstrates that

Commerce is dubious as to whether this particular methodology should be universally applicable

and announces that Commerce will continue to search for a widely applicable test.[13]

Accordingly, the Revocation has no effect on the court's conclusions in this case.

## IV.    Commerce's Financial Expense Rate Calculation

During its investigation, Commerce determined that DW had no viable home

market, and therefore, based normal value on constructed value, which required it to consider

DW's costs.  Preliminary Determination, at 3948–49; 19 U.S.C. § 1677b(a)(4), (e).  The

plaintiffs challenge Commerce's decision to calculate DW's financial expense rate without

including the financial expenses of GF. (Pls.' Mem. 39–40.)  Specifically, the plaintiffs assert

that Commerce departed from its established practice of using a combined financial expense rate

in cases involving collapsed entities.  (Id. at 45.)  This claim lacks merit.

Commerce's authority to collapse affiliated producers into a single entity for the

---

[13] The court notes that the nails test has been used by Commerce in three subsequent investigations, two of which occurred after the issuance of the Revocation.  See Polyethylene Retail Carrier Bags from Indonesia: Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination, 74 Fed. Reg. 56,807, 56,809 (Dep't Commerce Nov. 3, 2009); Polyethylene Retail Carrier Bags From Taiwan: Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination, 74 Fed. Reg. 55,183, 55,188 (Dep't Commerce Oct. 27, 2009); Certain New Pneumatic Off-The-Road Tires from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances, 73 Fed. Reg. 40,485, 40,485 (Dep't Commerce July 15, 2008).

purposes of an antidumping investigation, codified in 19 C.F.R. § 351.401(f),[14] has been affirmed

by the court.  See Queen's Flowers de Colom. v. United States, 981 F. Supp. 617, 622 (CIT

1997).  When dealing with collapsed entities, Commerce has established a "normal methodology

of calculating the financial-expense ratio based on the financial statements at the highest level of

consolidation normally prepared by the companies."  Issues and Decision Memorandum for the

Final Results of the Antidumping Duty Administrative Review of Certain Softwood Lumber

Products From Canada, A-122-838, POR 05/22/2002-04/30/2003, at 83 (Dec. 13, 2004)

("Softwood Lumber"), available at http://ia.ita.doc.gov/frn/summary/canada/E4-3751-1.pdf (last

visited Apr. 29, 2010).  "[W]here consolidated audited financial statements do not exist and are

not easily prepared, [Commerce has deemed] it appropriate to base the interest expense

calculation on the audited financial statements of the respondent."  Issues and Decision

Memorandum for the Antidumping Duty Administrative Review on Frozen Concentrated Orange

Juice from Brazil - May 1, 1998, through April 30, 1999, A-351-605, at comment 2 (Oct. 11,

2000), available at http://ia.ita.doc.gov/frn/summary/brazil/00-26074-1.txt (last visited Apr. 29,

2010).  If "using merely one company's financing information would not yield a more accurate

result," Commerce has "based financing expenses on the unconsolidated financial statements for

---

[14] 19 C.F.R. § 351.401(f)(1) provides that:

> In an antidumping proceeding under this part, the Secretary will treat two or more
> affiliated producers as a single entity where those producers have production
> facilities for similar or identical products that would not require substantial
> retooling of either facility in order to restructure manufacturing priorities and the
> Secretary concludes that there is a significant potential for the manipulation of
> price or production.

19 C.F.R. § 351.401(f)(1).

the [collapsed] entities . . . ." Id. In such a case, "the highest level of consolidation is the individual financial statements of each company." Softwood Lumber at 83.

In this case, Commerce collapsed DW and GF, but concluded that it was not necessary to include GF's financial expenses in the financial expense ratio calculation because GF "did not sell the merchandise under consideration in the United States and its home market was not viable during the [period of investigation] . . . ." Issues and Decision Memorandum at 29. Although Commerce stated at oral argument that it had the proper documentation to include GF's financial expenses in its calculation, Commerce maintained that its practice is to categorically exclude such expenses for the purposes of consistency because financial documents from companies that do not sell merchandise in the US are not always readily available. In response to this information, the plaintiffs acknowledged Commerce's normal practice, but argued that the degree of intertwining was anything but normal in this case. Some level of intertwining, by definition, will always exist between collapsed entities and the plaintiffs have failed to show that the intertwining in this case is so advanced beyond the norm that Commerce must deviate from its practice. There has been no showing that Commerce's decision to follow its usual methodology is inherently flawed. Commerce's decision to calculate DW's individual financial expense rate, therefore, was supported by substantial evidence and was not arbitrary because it was based on the financial statements of DW, which produced the merchandise. See Gulf States Tube Div. of Quanex Corp. v. United States, 981 F. Supp. 630, 647–48 (CIT 1997).

**V.      DW's Scrap Adjustment**

Finally, the plaintiffs challenge Commerce's decision to accept the second portion

of DW's claimed scrap "offset" as a reduction to its reported cost of production as not supported by substantial evidence. In support of this proposition, the plaintiffs cite to record evidence that a significant portion of these items included materials "clearly unrelated to the cost of producing nails," and therefore, should not have been included in the scrap "offset." (Pls.' Mem. 46–49.) In addition, the plaintiffs claim that the record demonstrates that: (1) the sale price of the miscellaneous items did not approximate the purchase cost, (2) the cost of the miscellaneous items were not included in the cost of production, and (3) the cost related to the revenues from the sale of scrap were not included in DW's reported cost of production. (Id.)

Under 19 C.F.R. § 351.401(b), Commerce may make adjustments "to export price, constructed export price, or normal value," so long as the Secretary ensures that "[t]he interested party that is in possession of the relevant information has the burden of establishing to the satisfaction of the Secretary the amount and nature of a particular adjustment," and does not "double-count adjustments." 19 C.F.R. § 351.401(b)(1)–(2). Commerce has clarified its typical practice regarding by-product offsets as:

> [A] respondent must first provide and substantiate the quantity of by-product it produced from subject merchandise during the [period of review]. Thus, in order to grant a by-product offset, it is [Commerce's] practice to require respondents to provide sufficient documentation of the actual amount of by-product produced. The reason for this practice is that [Commerce] must determine whether the respondent's production process for subject merchandise actually generated the amount of scrap claimed as a by-product offset.

Issues and Decision Memorandum for the Final Results of Antidumping Duty Administrative Review and New Shipper Review of Wooden Bedroom Furniture from the People's Republic of China, A-570-890, POR 01/01/2006-12/31/2006, at 70 (Aug. 11, 2008), available at

http://ia.ita.doc.gov/frn/summary/PRC/E8-19303-1.pdf (last visited Apr. 29, 2010).

In its cost verification, Commerce found that DW included the sale of extraneous materials as an offset because it had previously improperly added the cost of such items to its manufacturing cost. (Pls.' App. Tab 17 at 17–18.) Although Commerce incorrectly agreed with DW's description of this cost correction a "scrap offset," its decision to allow DW to back out improperly added costs is supported by its cost verification.[15] (See Id.) Any further discrepancies raised by the plaintiffs are de minimis and do not render the determination unsupported or arbitrary.[16]

---

[15] The plaintiffs cite several previous issues and decision memoranda in support of their proposition that the inclusion of these materials do not meet Commerce's "scrap offset criteria that the scrap offset must be related to the generation of scrap during the production of the merchandise under consideration . . . ." (Pls.' App. Tab 22 at 5.) Although if a true scrap offset were at issue, this argument might have weight, these decisions do not provide such a requirement given the circumstances of this case. See Issues and Decision Memorandum for the Final Results of Polyethylene Retail Carrier Bags ("PRCBs") from the People's Republic of China ("PRC"), A-570-886, POR 08/1/05-7/31/06, at 10–11 (March 10, 2008), available at http://ia.ita.doc.gov/frn/summary/PRC/E8-5300-1.pdf (last visited Apr. 29, 2010); Issues and Decision Memo for the Antidumping Duty Administrative Review of Stainless Steel Flanges from India - February 1, 2005 through January 31, 2006, A-533-809, at comment 2 (Aug. 13, 2007), available at http://ia.ita.doc.gov/frn/summary/INDIA/E7-15810-1.pdf (last visited Apr. 29, 2010). Further, in those investigations, Commerce indeed denied the by-product offset because the producer could not substantiate the type of scrap generated. Id. This information, however, was only necessary because Commerce needed to verify that the amount of the scrap offset claimed was correct, not whether the materials sold qualified for such an offset. See Id. Thus, these examples do not aid plaintiffs.

[16] The plaintiffs argue that the evidence on the record demonstrates that the scrap adjustment was overstated. First, the plaintiffs point to the fact that the record indicates that DW purchased wire rod at an average cost per metric ton of [[      ]] and sold the extraneous wire rod at a price of [[      ]] and [[      ]], resulting in an offset value that backed out more cost than DW initially put in. (Pls.' App. Tab 25 at 4.) The difference between these prices, however,

(continued...)

*Confidential Data Deleted*

**CONCLUSION**

For the aforementioned reasons and based on this record, the court concludes that utilization of the "nails test" for the targeted dumping analysis was reasonable and Commerce's determinations were supported by substantial evidence, and in accordance with law. Accordingly, the plaintiffs' Rule 56.2 motion for judgment on the agency record is denied. Judgment, therefore, will be entered for the defendant.

                                                                        /s/ Jane A. Restani
                                                                        Jane A. Restani
                                                                        Chief Judge

Dated: This 4th day of May, 2010.
          New York, New York.

---

[16](...continued)
results in a difference in value that is less than [[      ]] percent of the total value of the total scrap. The record also indicates that the aggregate of DW's output weighed [[            ]] pounds, which exceeds the input quantity of [[            ]] pounds. (Pls.' App. Tab 17 at 18.) The difference between these two values, however, is only [[     ]] pounds.

*Confidential Data Deleted*