**Slip Op. 14-104**

## UNITED STATES COURT OF INTERNATIONAL TRADE

BEIJING TIANHAI INDUS. CO., LTD., :

   Plaintiff, :

      :

    v. : Before: Richard K. Eaton, Senior Judge

      :

UNITED STATES, : Court No. 12-00203

      :

   Defendant, :

      :

NORRIS CYLINDER COMPANY, :

      :

   Defendant-Intervenor. :

### OPINION and ORDER

[Plaintiff's USCIT Rule 56.2 motion is granted in this targeted dumping case and the Final Determination is remanded to the Department of Commerce.]

Dated: September 9, 2014

*Mark E. Pardo* and *Andrew T. Schutz*, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of Washington, D.C., argued for plaintiff. With them on the brief was *Brandon M. Petelin*.

*Douglas G. Edelschick*, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, D.C., argued for defendant. With him on the brief were *Stuart F. Delery*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Franklin E. White, Jr.*, Assistant Director. Of counsel on the brief was *Deborah R. King*, Senior Counsel, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of Washington, D.C.

*Edward M. Lebow* and *Nora L. Whitehead*, Haynes and Boone, LLP, of Washington, D.C., argued for defendant-intervenor.

EATON, Judge: Before the court is plaintiff Beijing Tianhai Indus. Co., Ltd.'s

("Tianhai" or "plaintiff") USCIT Rule 56.2 Motion for Judgment on the Agency Record

challenging the United States Department of Commerce's ("Commerce" or "the Department") Final Determination published as *High Pressure Steel Cylinders From the People's Republic of China*, 77 Fed. Reg. 26,739 (May 7, 2012) (final determination of sales at less than fair value), and accompanying Issues and Decision Memorandum ("Issues & Dec. Mem.") (collectively, "Final Determination"), and the resulting order published as *High Pressure Steel Cylinders From the People's Republic of China*, 77 Fed. Reg. 37,377 (June 21, 2012) (antidumping duty order) (the "Order"). Resp'ts' Mot. for J. on the Agency R. Pursuant to Rule 56.2 (ECF Dkt. No. 32).

In the Final Determination, Commerce found that plaintiff had engaged in "targeted dumping" and, therefore, that it was permitted to apply an alternate methodology to calculate plaintiff's dumping margin. Issues & Dec. Mem. at cmt. 4. In making that finding, the Department determined that plaintiff had engaged in a pattern of sales under 19 U.S.C. § 1677f-1(d) (2006) which operated to mask sales at less than fair value made during the October 1, 2010 through December 31, 2010 period (the alleged period of targeted dumping). Plaintiff objects that (1) the methodology used by the Department to find that Tianhai engaged in a "pattern" of targeted dumping is contrary to 19 U.S.C. § 1677f-1(d)(1) and unsupported by substantial evidence; (2) in any case, the Department should have limited the application of its targeted dumping remedy to only those sales that it identified as having been made during the targeted time period; (3) the Department should have considered other valid commercial reasons for the alleged pattern of targeted dumping; and (4) the Department improperly used its zeroing[1] methodology to calculate plaintiff's rate after making its finding of targeted dumping. Pl.'s Mem.

---

[1] Zeroing is a methodology used for calculating an exporter's weighted average dumping margin "where negative dumping margins (i.e., margins of sales of merchandise sold at nondumped prices) are given a value of zero and only positive dumping margins (i.e., margins for sales of merchandise sold at dumped prices) are aggregated." *Union Steel v. United States*, 713 F.3d 1101, 1104 (Fed. Cir. 2013).

of Law in Supp. of Mot. for J. on the Agency R. Pursuant to Rule 56.2 1–2 (ECF Dkt. No. 32)

("Pl.'s Br.").

For the reasons set forth below, plaintiff's motion is granted, in part, and defendant's Final

Determination is remanded.

**BACKGROUND**

In 2011, in response to a petition filed by defendant-intervenor Norris Cylinder Company

("Norris" or "defendant-intervenor") alleging targeted dumping, the Department initiated an

antidumping duty investigation of high pressure steel cylinders from the People's Republic of

China ("PRC") and selected plaintiff as a mandatory respondent.   High Pressure Steel Cylinders

from the PRC, 76 Fed. Reg. 33,213 (Dep't of Commerce June 8, 2011) (initiation of antidumping

duty investigation); Issues & Dec. Mem.   The period of investigation ("POI") was October 1,

2010 through March 31, 2011, and the alleged period of targeted dumping was October 1, 2010

through December 31, 2010.   Issues & Dec. Mem.

The Department issued its Preliminary Determination of sales at less than fair value on

December 15, 2011, finding that plaintiff had engaged in targeted dumping during the October 1,

2010 through December 31, 2010 period.   High Pressure Steel Cylinders from the PRC, 76 Fed.

Reg. 77,964 (Dep't of Commerce Dec. 15, 2011) (preliminary determination of sales at less than

fair value) ("Preliminary Determination").   In doing so, the Department used the targeted

dumping test that has come to be known as the *Nails* test.[2]   That "methodology . . . involves a

---

[2]      "The *Nails* test derives its name from the cases in which it was first used."   *Timken Co. v. United States*, 38 CIT __, __ n.3, 968 F. Supp. 2d 1279, 1283 n.3 (2014) (citing Certain Steel Nails from the PRC, 73 Fed. Reg. 33,977 (Dep't of Commerce June 16, 2008) (final

(footnote continued)

two-stage test; the first stage addresses the pattern requirement [of 19 U.S.C. § 1677f-1(d)(1)(B)(i)

(2006)] and the second stage addresses the significant-difference requirement" of that statutory

provision.   Preliminary Determination, 76 Fed. Reg. at 77,968.   In applying the test, the

Department determined that there was "a pattern of prices for comparable merchandise that differs

significantly by time period (i.e., targeted dumping)."   Preliminary Determination, 76 Fed. Reg.

at 77,968.

To calculate plaintiff's antidumping duty rate, the Department used the

average-to-transaction ("A-T") methodology[3] because it found that its normally used

average-to-average ("A-A") methodology[4] could not properly account for the alleged targeted

dumping.   Preliminary Determination, 76 Fed. Reg. at 77,968.   To calculate Tianhai's dumping

margin, the Department applied the A-T methodology, with zeroing, to all of plaintiff's U.S. sales

during the POI, not only to those sales that the Department found to be "targeted" using the *Nails*

test.   Preliminary Determination, 76 Fed. Reg. at 77,968.

In the Final Determination, the Department continued to use the *Nails* test to find that there

was a pattern of sales that differed significantly by time period.[5]   It again insisted that the

differences could not be taken into account using the "A-A methodology because the A-to-A

---

determination of sales at less than fair value and partial affirmative determination of critical
circumstances); Certain Steel Nails from the United Arab Emirates, 73 Fed. Reg. 33,985 (Dep't of
Commerce June 16, 2008) (notice of final determination of sales at not less than fair value)).

[3]      The A-T methodology compares "the weighted average of the normal values to the
export prices (or constructed export prices) of individual transactions."   19 U.S.C. §
1677f-1(d)(1)(B).

[4]      The A-A methodology compares "the weighted average of the normal values to the
weighted average of the export prices (and constructed export prices) for comparable
merchandise."   19 U.S.C. § 1677f-1(d)(1)(A)(i).

[5]      The Department made one adjustment to the dates of the sales within the allegedly
targeted period.   That change is not challenged here.

methodology conceals differences in price patterns between the targeted and non-targeted groups by averaging low-priced sales to the targeted group with high-priced sales to the non-targeted group." Final Determination, 77 Fed. Reg. at 26,740; Issues & Dec. Mem. at cmt. 4. In using the A-to-T methodology, the Department continued to apply its zeroing methodology to all of plaintiff's U.S. sales. Final Determination, 77 Fed. Reg. at 26,740; Issues & Dec. Mem. at cmt. 4. This action challenging the Final Determination followed.

## STANDARD OF REVIEW

"The court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i) (2006).

## DISCUSSION

**I.      LEGAL FRAMEWORK**

### A. Statutory Framework

During an antidumping investigation, the Department ordinarily determines whether dumping has occurred by using one of the two methodologies identified in 19 U.S.C. § 1677f-1(d)(1)(A). The general rule is that, when determining an exporter's dumping margin, the Department should compare the weighted average normal value of an exporter's merchandise to the average of the exporter's export prices (or constructed export prices) during the POI. If the difference between the weighted average normal value of an exporter's merchandise and the average of an exporter's export prices is a positive number, then dumping is present. Thus, 19 U.S.C. § 1677f-1(d)(1)(A)(i) provides for an average-to-average comparison of an exporter's

transactions, a methodology known as A-A. 19 U.S.C. § 1677f-1(d)(1)(A)(ii) also permits the Department to determine an exporter's margin "by comparing the normal values of individual transactions to the export prices . . . of individual transactions for comparable merchandise" ("T-T"), but the Department's regulations limit the use of this methodology. *See* 19 C.F.R. § 351.414(c)(2) (2012) ("The Secretary [of Commerce] will use the transaction-to-transaction method only in unusual situations, such as when there are very few sales of subject merchandise and the merchandise sold in each market is identical or very similar or is custom-made.").

In enacting the statute, however, Congress recognized that there might be situations where the general "methodology cannot account for a pattern of prices that differ significantly among purchaser, regions, or time periods, *i.e.*, where targeted dumping may be occurring." Uruguay Round Agreements Act, Statement of Administrative Action, H.R. DOC. NO. 103-316, vol. 1, at 843 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4178 ("SAA"). Congress anticipated that the patterns of sales might be identifiable on the basis of "purchasers, regions, or time periods."[6] SAA, H.R. DOC. NO. 103-316, vol. 1, at 843, *reprinted in* 1994 U.S.C.C.A.N. at 4178. Accordingly, the statute provides that the Department

> may determine whether the subject merchandise is being sold in the United States at less than fair value by comparing the weighted average of the normal values to the export prices (or constructed export prices) of individual transactions for comparable merchandise, if—(i) there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time, and (ii) the administering authority explains why such differences cannot be taken into account

using A-A or T-T. 19 U.S.C. § 1677f-1(d)(1)(B) (2006); SAA, H.R. DOC. NO. 103-316, vol. 1, at 843, *reprinted in* 1994 U.S.C.C.A.N. at 4178 ("Before relying on this methodology, however, Commerce must establish and provide an explanation why it cannot account for such differences

---

[6]    As noted, in this case, Norris alleged targeting on the basis of time period.

through the use of [A-A] or [T-T]").   Thus, the statute requires that the Department (1) identify a pattern of pricing that differs significantly among purchasers, and (2) explain what about that particular pattern makes the use of A-A or T-T inappropriate.   If the Department finds that 19 U.S.C. § 1677f-1(d)(1)(B)(i) and 19 U.S.C. § 1677f-1(d)(1)(B)(ii) are satisfied, it may compare the weighted average of the normal values to each individual export (or constructed export) price when determining an exporter's margin.   Put another way, if both requirements of 19 U.S.C. § 1677f-1(d)(1)(B) are met, the Department may use A-T to determine the exporter's dumping margin.

"While the statute prefers the two general methodologies [(A-A and T-T)] over the exception methodology [(A-T)], it is silent as to when to apply the general two methodologies. Further, the statute is also silent as to the body of sales to which Commerce will apply the exception methodology."   *Chang Chun Petrochemical Co. v. United States*, 37 CIT __, __, 906 F. Supp. 2d 1369, 1375 (2013) (citation omitted).   The so-called *Chevron* line of cases provides guidance to Courts when a statute is silent or ambiguous.   *Chevron, U.S.A., Inc. v. Nat'l Res. Def. Council, Inc.*, 467 U.S. 837, 842–45 (1984).   "[A]gencies are entitled to formulate policy and make rules 'to fill any gap left, implicitly or explicitly, by Congress.'"   *SKF USA Inc. v. United States*, 254 F.3d 1022, 1030 (Fed. Cir. 2001) (quoting *Chevron*, 467 U.S. at 843).   Thus, because of the gap in the targeted dumping provision left by Congress, this Court has repeatedly held that the Department's policies filling that gap are entitled to some deference.   *See Timken Co. v. United States*, 38 CIT __, __ n.7, 968 F. Supp. 2d 1279, 1286 n.7 (2014); *Gold East Paper (Jiangsu) Co. v. United States*, 37 CIT __, __, 918 F. Supp. 2d 1317, 1320–21 (2013); *Chang Chun Petrochemical*, 37 CIT at __, 906 F. Supp. 2d at 1375; *Mid Continent Nail Corp. v. United States*, 34 CIT __, __, 712 F. Supp. 2d 1370, 1376–77 (2010).

**B. Regulatory Framework and Departmental Practice**

Although the Department has the authority to promulgate regulations and establish practices where Congress has left statutory gaps, its discretion is not unfettered.   Moreover, once the Department has promulgated a regulation, it is obliged to follow its own regulation so long as the regulation remains in force.   *Pujiang Talent Diamond Tools Co. v. United States*, 37 CIT __, __, Slip Op. 13-58, at 15 (2013), *aff'd* 561 Fed. App'x 988 (Fed. Cir. 2014) (citing *United States v. UPS Customhouse Brokerage, Inc.*, 575 F.3d 1376, 1382 (Fed. Cir. 2009)).   Where the Department has not taken the formal step of promulgating a regulation, but has established a practice, it must follow that practice unless it has provided an explanation for its changed approach.   *See Jinxiang Yuanxin Imp. & Exp. Co. v. United States*, 37 CIT __, __, Slip Op. 13-77, at 13–14 (2013) (citation omitted).

*1.  Commerce's Regulations*

In 1997, as part of the implementation of the provisions of the Uruguay Round Agreements Act, the Department promulgated regulations regarding the targeted dumping provisions of 19 U.S.C. § 1677f-1(d)(1)(B).   Antidumping Duties; Countervailing Duties, 62 Fed. Reg. 27,296, 27,373–76 (Dep't of Commerce May 19, 1997).   In 2008, however, the Department issued a notice, without first seeking specific public comment, withdrawing these regulations.   *Gold East Paper*, 37 CIT at__, 918 F. Supp. 2d at 1325; 19 C.F.R. § 351.414(f) (2007); Withdrawal of the Regulatory Provisions Governing Targeted Dumping in Antidumping Duty Investigations, 73 Fed. Reg. 74,930 (Int'l Trade Admin. & Imp. Admin. Dec. 10, 2008) ("Withdrawal Notice").

Prior to the issuance of the Withdrawal Notice, 19 C.F.R. § 351.414(f) contained the following language:

> (f) Targeted dumping—(1) . . . the Secretary may apply the average-to-transaction method . . . in an antidumping investigation if: (i) As determined through the use of, among other things, standard and appropriate statistical techniques, there is targeted dumping in the form of a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time . . . .
>
> (2) *Limitation of average-to-transaction method to targeted dumping.* Where the criteria for identifying targeted dumping under paragraph (f)(1) of this section are satisfied, the Secretary normally will limit the application of the average-to-transaction method to those sales that constitute targeted dumping under paragraph (f)(1)(i) of this section.

19 C.F.R. § 351.414(f) (2007). The withdrawn regulation, therefore, required the Department to identify the set of sales that made up the "pattern of export prices" constituting the targeted dumping, and to limit its application of the A-T methodology to those sales. Thus, were the regulation in effect for this case, the A-T methodology would be applied only for the October 1, 2010 to December 31, 2010 period. Following withdrawal, however, the regulation no longer prohibited the Department from applying A-T to all of a respondent's sales and thus no longer restricted the use of A-T to only those sales that constitute the pattern of "targeted dumping."

### 2. *The Nails Test*

In order to determine whether the requirements of 19 U.S.C. § 1677f-1(d)(1)(B)(i) have been met under the *Nails* test, the Department engages in a two-step statistical analysis. The first step of the test, also known as the "standard deviation test," seeks to determine whether there is "a pattern of sales" consistent with targeted selling of merchandise. To do so here, the Department "determined the share of subject merchandise sales allegedly targeted by time period that were at prices more than one standard deviation below the weighted-average price during all time periods, targeted and not-targeted." Def.'s Resp. to Pl.'s Mot. for J. upon the Agency R. 13 (ECF Dkt. No. 47) ("Def.'s Br.") (citing Issues & Dec. Mem. at cmt. 4). The Department performed this "test on

a product-specific basis, using the weighted-average price for the alleged targeted time period (October through December 2010), and for the time period not alleged to be targeted (January through March 2011)." Def.'s Br. 13–14 (citing Issues & Dec. Mem. at cmt. 4).

Under the standard deviation test, Commerce finds that a pattern of sales at differing prices is present "if the volume of sales that are more than one standard deviation below the weighted average price exceeds 33 percent of the total volume of the respondent's sales of subject merchandise during the allegedly targeted period." Def.'s Br. 14 (citing Issues & Dec. Mem. at cmt. 4). Thus, in a case in which targeting based on time-period has been alleged, the Department compares the individual prices of the sales during the allegedly targeted period to the weighted average price of all sales during that period in order to determine the range of sales prices, and finds a pattern to be present if more than a third of those individual sales are at more than one standard deviation away from the weighted average.

If the Department determines that more than 33 percent of the sales in the allegedly targeted period are more than one standard deviation from the weighted average, i.e., that a pattern of differing prices exists, it proceeds to the second step of the *Nails* test, also known as the "gap test," to determine if the identified pattern of differently priced sales represented a "significant difference" in pricing. The Department

> first calculates the difference between the weighted-average price of allegedly targeted sales and the next higher weighted-average price of sales to a non-targeted [time period] (the "target gap"). Next, Commerce calculates the average difference, weighted by sales volume, between the prices to non-targeted [periods] (the "non-target gap"). Finally, the agency compares the target gap to the non-target gap. If the target gap exceeds the non-target gap for more than five percent of the exporter's sales to the alleged target by volume, Commerce finds that targeted dumping occurred.

*CP Kelco Oy v. United States*, 38 CIT __, __, Slip Op. 14-42, at 5 (2014) (footnote omitted). In other words, the Department looks to see if the variation in pricing between the targeted and

non-targeted group is greater than the variation in pricing within the non-targeted group for more than five percent of an exporter's sales.

This Court has found these two steps to be a reasonable method for determining whether the requirements of 19 U.S.C. § 1677f-1(d)(1)(B)(i) have been met.  *See JBF RAK LLC v. United States*, 38 CIT __, __, Slip Op. 14-78, at 14–15 (2014); *CP Kelco Oy*, 38 CIT at __, Slip Op. 14-42, at 14–15; *Timken*, 38 CIT at __, 968 F. Supp. 2d at 1283; *Mid Continent Nail*, 34 CIT at __, 712 F. Supp. 2d at 1377–78.


II.     **ANALYSIS**

   **A. Plaintiff Failed to Exhaust its Administrative Remedies Regarding its "Pattern" Argument**

Plaintiff's central argument was not made during the administrative proceedings before Commerce.   Plaintiff contends here, for the first time, that the legislative history and purpose of 19 U.S.C. § 1677f-1(d)(1)(B) show that the Department's application of the *Nails* test in this case was improper because the test can identify a pattern of targeted dumping based on non-dumped sales.   Specifically, it argues that the Department's use of the *Nails* test is contrary to the intent of Congress when Commerce only identifies an extremely small number of dumped sales as part of the "pattern."   For plaintiff, because, here, the test can be met by identifying outlier sales that are not at less than fair value, the test does not necessarily identify a "pattern" of sales at less than fair value.   Rather, according to plaintiff, it only identifies a pattern of sales at disparate pricing. Thus, plaintiff argues that the *Nails* test fails to meet the statutory requirement of identifying a "pattern" if a substantial number of the disparately priced sales are not also sales at less than fair value (i.e., sales that are non-dumped).   Pl.'s Br. 11–12.

The Department and defendant-intervenor object to this argument being raised for the first time in Tianhai's brief before the court, and Tianhai concedes that it never made this argument during the administrative proceedings.   *See* Pl.'s Reply Br. 2–5 (ECF Dkt No. 50) ("Pl.'s Reply"). Instead, plaintiff asserts that its failure to argue this position before the Department should be excused under the "pure question of law" exception.   Pl.'s Reply 2.   This argument is unavailing.

"[W]here appropriate," a Court shall "require the exhaustion of administrative remedies." 28 U.S.C. § 2637(d) (2006); *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1381 (Fed. Cir. 2013).   "'The exhaustion doctrine requires a party to present its claims to the relevant administrative agency for the agency's consideration before raising these claims to the Court.'"   *Shandong Huarong Machinery Co. v. United States*, 30 CIT 1269, 1305, 435 F. Supp. 2d 1261, 1292 (2006) (quoting *Ingman v. U.S. Sec'y of Agric.*, 29 CIT 1123, 1126 (2005)).   "This court has discretion to determine when it will require the exhaustion of administrative remedies." *Blue Field (Sichuan) Food Indus. Co. v. United States*, 37 CIT __, __, 949 F. Supp. 2d 1311, 1321 (2013) (citation omitted).   Accordingly, "failure to exhaust administrative remedies is not always fatal to a party's objections to administrative action," and courts have excused a party's failure to meet the exhaustion requirement where the raised objection is a "pure question of law." *Xinjiamei Furniture (Zhangzhou) Co. v. United States*, 38 CIT __, __, 968 F. Supp. 2d 1255, 1266–67 (2014) (discussing the exceptions).

One of the purposes of the exhaustion requirement is the "protect[ion of] administrative agency authority."   *Itochu Bldg. Prods. v. United States*, 733 F.3d 1140, 1145 (Fed. Cir. 2013) (citation omitted).   For this reason, the "pure question of law" exception has only been applied where "[s]tatutory construction alone is sufficient to resolve [the] case."   *Consol. Bearings Co. v. United States*, 348 F.3d 997, 1003 (Fed. Cir. 2003).   Thus, even where a question of statutory

construction is raised, the claim must be one that requires no exercise of agency discretion.   *See*

*Itochu*, 733 F.3d at 1146 (citing *Agro Dutch Indus. v. United States*, 508 F.3d 1024, 1029 (Fed. Cir.

2007)).

Plaintiff asserts that its failure to exhaust its administrative remedies should be excused

because its challenge is a pure question of law.   First, it maintains that the pattern and explanation

requirements of 19 U.S.C. § 1677f-1(d)(1)(B) are unambiguous and are "explicit requirements

[that] Commerce must satisfy before resorting to an alternative price comparison methodology."

Pl.'s Reply 2.   According to plaintiff, its objection is a pure question of law "because Commerce

failed to satisfy the[] enumerated [pattern and explanation] requirements in the statute."   Pl.'s

Reply 2.   Thus, plaintiff's position is that 19 U.S.C. § 1677f-1(d)(1)(B) provides such a clear

congressional directive to the Department, that no exercise of agency discretion is needed to

determine whether its requirements have been met.   The court is not persuaded by this argument.

This Court has repeatedly held that 19 U.S.C. § 1677f-1(d)(1)(B) is sufficiently ambiguous

to permit the Department some discretion as to what methodologies it may use to meet the

statutory pattern and explanation requirements.   Indeed, as noted, this Court has upheld the *Nails*

test itself as a reasonable method for determining whether the requirements of 19 U.S.C. §

1677f-1(d)(1)(B)(i) have been met.   *See CP Kelco Oy*, 38 CIT at __, Slip Op. 14-42, at 15; *Mid*

*Continent Nail*, 34 CIT at __, 712 F. Supp. 2d at 1377–78.   Because the Department has some

discretion to determine the methodology it may use, this is not a case where the construction of a

statute may properly be considered without the input of the department to which its administration

is entrusted.   *See Fuwei Films (Shandong) Co. v. United States*, 35 CIT __, __, 791 F. Supp. 2d

1381, 1384, 1385 (2011) (holding that the pure question of law exception "only *might* apply for a

clear statutory mandate that does not implicate Commerce's interpretation of the statute under the

second step of *Chevron* . . . . The pure question of law exception cannot apply [where an agency has discretion] because its application would undermine the very purposes the exhaustion requirement is designed to protect").

Beyond its "pure question of law" claim, plaintiff further contends that the Department's commentary on other arguments advanced during the administrative proceess excuses its failure to make its argument in the underlying proceeding. In the Final Determination, the Department responded to several arguments that Tianhai made in its case brief attacking the *Nails* test's methodology, challenging the application of A-T to a respondent's entire sales database, arguing against the use of zeroing, and positing that Commerce should apply a *de minimis* standard. In responding to these arguments, the Department explained its interpretation of the statute in relation to the particular arguments that plaintiff advanced. *See, e.g.*, Issues & Dec. Mem. at cmt. 4 ("The Department finds that the language of [19 U.S.C. § 1677f-1(d)(1)(B)] of the Act does not preclude adopting a similarly uniform application of the alternative A-to-T methodology for all transactions when satisfaction of the statutory criteria suggests that application of the A-to-T methodology is the appropriate method. The only limitations the statute places on the application of the alternative A-to-T methodology are the satisfaction of the two criteria set forth in the provision. When the criteria for application of the alternative A-to-T methodology are satisfied, [19 U.S.C. § 1677f-1(d)(1)(B)] does not limit application of the alternative A-to-T methodology to certain transactions." (footnotes omitted)). According to plaintiff, because the Department explained its interpretation of 19 U.S.C. § 1677f-1(d)(1)(B) when rejecting these arguments, the Department's "claim that Commerce lacked an opportunity to articulate its interpretation of the statute is baseless." Pl.'s Reply 4 (citation omitted) (internal quotation marks omitted).

While the Federal Circuit has recognized that the Court of International Trade may reach a question not presented to the Department if "additional proceedings would [not] further develop the interpretation offered," doing so is not appropriate here. *Agro Dutch Indus. v. United States*, 508 F.3d 1024, 1029 n.4 (Fed. Cir. 2007). Here, the Department was never asked to make a determination on, and did not directly address, whether the pattern requirement of 19 U.S.C. § 1677f-1(d)(1)(B) could be satisfied by a showing of disparately priced, but non-dumped, sales. Because there is no indication that Commerce would not have addressed this question, brought up here for the first time, it would have been "preferable to have the agency's interpretation of the statute that it is entrusted to administer, set forth on the administrative record." *Fuwei Films*, 35 CIT at __, 791 F. Supp. 2d at 1384 (citations omitted). Preserving the Department's authority to directly address an issue in the first instance is one of the central purposes of the exhaustion requirement, and the court will not abandon that purpose here by reaching an argument not plainly raised before Commerce. *See Itochu Bldg. Prods.*, 733 F.3d at 1145.

Accordingly, because plaintiff failed to exhaust its administrative remedy with respect to its "pattern" argument, the court will not consider it.

**B. The Department Did Not Adequately Explain Why A-to-A or T-to-T Could Not Take into Account the Difference in Pricing**

Before the Department, and again here, plaintiff argues that Commerce failed to meet the explanation requirement of 19 U.S.C. § 1677f-1(d)(1)(B)(ii). As noted, that provision requires the Department to explain why the differences in the pattern of prices identified in 19 U.S.C. § 1677f-1(d)(1)(B)(i) "cannot be taken into account" using the standard methodologies. Thus, if Commerce seeks to use A-T, it must explain why it cannot use A-A and T-T. Here, the Department's two-sentence explanation for why the pattern it identified could not be taken into

account by the standard methodologies was insufficient because that explanation did nothing more than state the conclusion that the requirements of 1677f-1(d)(1)(B)(i) had been met.

After stating that it had "found targeted dumping for the final determination because there was a pattern of prices that differ significantly by time period," the Department continued that,

> [i]n doing so, the Department finds that the pattern of price differences identified cannot be taken into account using the standard A-to-A methodology because the A-to-A methodology conceals differences in price patterns between the targeted and non-targeted groups by averaging low-priced sales to the targeted group with high-priced sales to the non-targeted group.   Thus, the Department finds, pursuant to [19 U.S.C. § 1677f-1(d)(1)(B)(ii)], that application of the standard A-to-A methodology would result in the masking of dumping that is unmasked by application of the alternative A-to-T methodology when calculating [plaintiff's] weighted-average dumping margin.

Issues & Dec. Mem. at cmt. 4.   This explanation neither makes mention of how the Department reached this conclusion nor references any record evidence supporting the conclusion.   Moreover, the explanation ignores the potential use of the T-T methodology entirely.   In other words, the Department's purported explanation says nothing more than that Commerce has found a pattern of differing prices and invokes the mathematical truism that, when you average a set of numbers, the differences among the individual numbers averaged, cease to be apparent.   Thus, it is the case that any time a pattern of disparate pricing exists, averaging the prices will "mask" the differences in the individual prices.

A demonstration that a pattern of disparate pricing exists is sufficient to satisfy 19 U.S.C. § 1677f-1(d)(1)(B)(i) because that is what the statute demands in that subsection.   Identification of a pattern, however, cannot be sufficient to also satisfy 19 U.S.C. § 1677f-1(d)(1)(B)(ii), which creates a separate statutory explanation requirement, because to do so would render that second, separately provided for requirement, mere surplusage.   Otherwise, the Department's satisfaction of 19 U.S.C. § 1677f-1(d)(1)(B)(i) would in every case also satisfy 19 U.S.C. §

1677f-1(d)(1)(B)(ii).   Therefore, if the Department's explanation here were sufficient, any time that "a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time" could be identified to satisfy the requirement of 19 U.S.C. § 1677f-1(d)(1)(B)(i), a mere description of what happens when you average a set of numbers would suffice to satisfy 19 U.S.C. § 1677f-1(d)(1)(B)(ii).   The statute requires more.

In creating an explanation requirement in 19 U.S.C. § 1677f-1(d)(1)(B)(ii), Congress anticipated that "pattern[s] of prices that differ significantly among purchasers, regions, or time periods," could sometimes be accounted for without resorting to A-T.   SAA, H.R. DOC. NO. 103-316, vol. 1, at 843, *reprinted in* 1994 U.S.C.C.A.N. at 4178.   Accordingly, Congress required the Department to explain why A-A and T-T cannot account for a pattern of disparate prices before using A-T.   SAA, H.R. DOC. NO. 103-316, vol. 1, at 843, *reprinted in* 1994 U.S.C.C.A.N. at 4178 ("Before relying on this methodology, however, Commerce must establish and provide an explanation why it cannot account for such differences through the use of an average-to-average or transaction-to-transaction comparison.").   Thus, if no explanation other than the bare-bones invocation of the differing natures of the A-to-A and A-to-T methodologies would suffice to satisfy 19 U.S.C. § 1677f-1(d)(1)(B)(ii), as defendant and defendant-intervenor would have it, that statutory provision would be superfluous.

Here, the Department has supplied a conclusion but not an explanation.   The Department's failure to provide an explanation sufficient to satisfy 19 U.S.C. § 1677f-1(d)(1)(B)(ii) was an error of law, and thus, a remand for the Department to provide such explanation is required.   On remand, the Department must do more than simply state that the pattern identified to satisfy 19 U.S.C. § 1677f-1(d)(1)(B)(i) would be hidden using A-to-A.   It

must explain, based on record evidence, why the presence of the pattern renders A-to-A or T-to-T inappropriate methodologies.


### C.  The Application of 19 C.F.R. § 351.414(f) (2007)

Plaintiff argues that 19 C.F.R. § 351.414(f) (2007) was improperly withdrawn and that the Department's application of A-T to all of its sales is contrary to that regulation.   To support its position, plaintiff relies on this Court's decision in *Gold East Paper*, a decision that was issued after the initial briefing in this case.[7]   *Gold East Paper*, 37 CIT at __, 918 F. Supp. 2d at 1327–28; *Baroque Timber Indus. (Zhongshan) Co. v. United States*, 37 CIT __, __ n.10, 925 F. Supp. 2d 1332, 1340 n.10 (2013); *see also Timken*, 38 CIT at __ n.8, 968 F. Supp. 2d at 1291 n.8.

This Court held in *Gold East Paper* that the Department's 2008 withdrawal of 19 C.F.R. § 351.414(f) (2007) was in violation of the "Administrative Procedure Act's ('APA') . . . notice and comment requirements."   *Gold East Paper*, 37 CIT at __, 918 F. Supp. 2d at 1325 (citation omitted); Withdrawal Notice, 73 Fed. Reg. 74,930.   In particular, the *Gold East Paper* Court concluded that the Department was required to provide pre-withdrawal notice and comment, and rejected Commerce's argument "that the withdrawal did not require notice and comment under the 'good cause' exception."   *Gold East Paper*, 37 CIT at __, 918 F. Supp. 2d at 1326–28.   This Court has similarly observed elsewhere, in dictum, that the Department's "defense of the withdrawal does not appear strong."   *Baroque Timber*, 37 CIT at __ n.10, 925 F. Supp. 2d at 1340 n.10; *see also Timken*, 38 CIT at __ n.8, 968 F. Supp. 2d at 1291 n.8.

---

[7]      The Department and defendant-intervenor have argued that this claim should be deemed waived because of plaintiff's failure to raise this issue in its opening brief.   Because the court finds that plaintiff's argument fails on the merits, it declines to reach the waiver issue.

While it may be that the Withdrawal Notice failed to comply with the APA's notice and comment requirement, plaintiff's argument that the Department must continue to apply 19 C.F.R. § 351.414(f) (2007) in this case is unpersuasive. That is, even if Commerce erred in its issuance of the Withdrawal Notice, that error is harmless as it applies to plaintiff, and the Department is not bound by the withdrawn regulation here.

"It is well settled that principles of harmless error apply to the review of agency proceedings." *Intercargo Ins. Co. v. United States*, 83 F.3d 391, 394 (Fed. Cir. 1996). Although the Federal Circuit has not passed on the applicability of the harmless error rule in the context of a violation of the notice and comment requirements of the APA specifically, this Court and several Courts of Appeals have considered the principle in this context. *See, e.g.*, *Impact Steel Canada Corp. v. United States*, 31 CIT 2065, 2073, 533 F. Supp. 2d 1298, 1305 (2007); *United States v. Reynolds*, 710 F.3d 498, 514–24 (3d Cir. 2013) (collecting cases); *United States v. Byrd*, 419 Fed. App'x 485, 490 (5th Cir. 2011) ("[W]e hold that the Attorney General's APA violations were also harmless error under the circumstances presented by Byrd."); *United States v. Dean*, 604 F.3d 1275 (11th Cir. 2010); *Conservation Law Found. v. Evans*, 360 F.3d 21 (1st Cir. 2004); *Sugar Cane Growers Co-op of Fl. v. Veneman*, 289 F.3d 89 (D.C. Cir. 2002); *Riverbend Farms, Inc. v. Madigan*, 958 F.2d 1479 (9th Cir. 1992).

When determining whether a party is prejudiced by a violation of the APA, the court must first identify the interest of the private party that is potentially prejudiced. The "relevant harm" to be analyzed when the Department fails to comply with the APA's notice and comment procedures is whether "an interested party has lost the opportunity to alter the agency's decision through full participation in the regulatory process." *Parkdale Int'l, Ltd. v. United States*, 31 CIT 1229, 1237, 508 F. Supp. 2d 1338, 1348 (2007) (citing *Wind River Mining Corp. v. United States*, 946 F.2d

710, 715 (9th Cir. 1991)). In other words, the application of a particular regulation to a party is not the harm that must be demonstrated to obviate agency action for failure to comply with notice and comment procedures.[8] Rather, a party must show that it was injured by being prevented from participating in a public discussion with the agency about the proposed regulation. *See, e.g.*, *Byrd*, 419 Fed. App'x at 491 ("Byrd was also not prejudiced . . . . He neither proposes comments he would have made during a comment period nor did he choose to involve himself in the post-promulgation comment period." (citation omitted) (internal quotation marks omitted)).

Where "the technical errors in the process used did not prevent the exchange of views, information, and criticism between interested persons and the agency," errors in following the notice and comment requirements may be found to be harmless. *Reynolds*, 710 F.3d at 517, 518 (internal quotation marks omitted) ("Technical errors are often harmless absent a demonstration that the challenger would have made a comment to the rule not considered by the agency because these errors often do not prevent the purposes of notice and comment from being satisfied." (citing *Riverbend Farms*, 958 F.2d at 1487)).

Here, plaintiff can show no harm from its lost opportunity to alter the agency's decision. Public comments relevant to the Department's decision to withdraw 19 C.F.R. § 351.414(f) (2007) were submitted to the Department prior to the publication of the Withdrawal Notice, having been submitted by other interested parties. Unlike those interested parties, Tianhai submitted no comments to the Department either before or after the Withdrawal Notice was issued, and Tianhai has identified no arguments it would have made that were not presented to the Department by

---

[8] The court recognizes that there is some disagreement as to the proper harm to be considered as part of a harmless error analysis for violations of the APA's notice and comment requirement. *See Mid Continent Nail Corp. v. United States*, 38 CIT __, __, Slip Op. 14-72, at 30–31 (2014).

others.    Accordingly, the Department's failure to invite notice and comment prior to issuing the Withdrawal Notice was harmless error as to Tianhai.

First, it is clear that a public conversation regarding the future enforcement of the targeted dumping statute, including the scope of the application of A-T and, therefore, 19 C.F.R. § 351.414(f) (2007), was occurring between the Department and others interested in the issue, prior to the issuance of the Withdrawal Notice.   This conversation began, at least officially, when the Department sought public comments on its targeted dumping methodology on October 25, 2007, and continued through a second request for public comments on May 9, 2008, well before the issuance of the Withdrawal Notice on December 10, 2008.   Targeted Dumping in Antidumping Investigations, 72 Fed. Reg. 60,651, 60,651 (Dep't of Commerce Oct. 25, 2007) (request for comment) ("First Comment Request") ("[T]he Department requests comments and suggestions on what guidelines, thresholds, and tests it should use in determining whether targeted dumping is occurring."); Proposed Methodology for Identifying and Analyzing Targeted Dumping in Antidumping Investigations, 73 Fed. Reg. 26,371, 26,372 (Dep't of Commerce May 9, 2008) (request for comment) ("Second Comment Request") ("[T]he Department requests comment on the application of the alternative calculation methodology (average–to-transaction comparison) and the conditions, if any, under which the alternative methodology should apply to *all* sales to the target even if some sales of a control number do not pass the targeted dumping test.") (collectively, the "Comment Requests").

Nineteen interested parties submitted comments to the First Comment Request, though Tianhai did not.   *See* December 7, 2010 Comments on Targeted Dumping in Antidumping Investigations, IMPORT ADMINISTRATION, http://enforcement.trade.gov/download/targeted-

dumping/comments-20071210/td-cmt-20071210-index.html.    Several of those comments

discussed the proper application of the A-T methodology once a finding of targeted dumping has

been made.    *See* Letter from David A. Hartquist, Executive Director, Committee to Support U.S.

Trade Laws, to The Honorable David Spooner, Assistant Secretary for Import Administration,

U.S. Department of Commerce (Dec. 10, 2007), *available at* http://enforcement.trade.gov/

download/targeted-dumping/comments-20071210/csustl-td-cmt-20071210.pdf (arguing that A-T

should be applied to all sales if more than 20 percent of an importer's sales are found to be

targeted); Letter from Daniel L. Porter, Counsel for the Japan Iron & Steel Federation, to The

Honorable David Spooner, Assistant Secretary for Import Administration, U.S. Department of

Commerce (Dec. 10, 2007), *available at* http://enforcement.trade.gov/download/targeted-

dumping/comments-20071210/jisf-td-cmt-20071210.pdf (discussing the proper remedy once a

finding of targeted dumping has been made); Letter from Haruhiko Kuramochi, Executive

Managing Director, Japanese Machinery Center for Trade and Investment, to The Honorable

David Spooner, Assistant Secretary for Import Administration, U.S. Department of Commerce at

4–5 (Nov. 23, 2007), *available at* http://enforcement.trade.gov/download/targeted-dumping/

comments-20071210/jmc-td-cmt-20071210.pdf ("Because the application of the

average-to-transaction method is intended to unmask targeted dumping, there is no reason to apply

the average-to-transaction method to non-targets. . . . As suggested by the WTO Appellate Body,

non-targets are outside of the scope of targeted dumping, and therefore outside of the application

of the targeted dumping methodology.    For non-targets, therefore, the average-to-average method

must apply.    The average-to-transaction method should apply only to targets."); Letter from

William A. Fennell, Stewart and Stewart, to The Honorable David Spooner, Assistant Secretary

for Import Administration, U.S. Department of Commerce (Dec. 10, 2007), *available at*

http://enforcement.trade.gov/download/targeted-dumping/comments-20071210/stewart-stewart-td-cmt-20071210.pdf (arguing that A-T should be applied to all sales if more than 20 percent of an importer's sales are found to be targeted); Letter from Jeffrey D. Gerrish, Counsel for United States Steel Corporation, to The Honorable David Spooner, Assistant Secretary for Import Administration, U.S. Department of Commerce (Dec. 10, 2007), *available at* http://enforcement.trade.gov/download/targeted-dumping/comments-20071210/us-steel-td-cmt-20071210.pdf (arguing that A-T should be applied to all sales if more than 20 percent of an importer's sales are found to be targeted or where the extent of the targeting cannot be determined); Letter from Leo W. Gerard, International President, Counsel for United Steelworkers, to The Honorable David Spooner, Assistant Secretary for Import Administration, U.S. Department of Commerce (Dec. 10, 2007), *available at* http://enforcement.trade.gov/download/targeted-dumping/comments-20071210/usw-td-cmt-20071210.pdf (arguing that A-T should be applied to all sales if more than 20 percent of an importer's sales are found to be targeted).

In response to the Second Comment Request, fifteen interested parties submitted comments on or before June 23, 2008.   June 23, 2008 Comments on Targeted Dumping in Antidumping Investigations, IMPORT ADMINISTRATION, http://enforcement.trade.gov/download/targeted-dumping/comments-20080623/td-cmt-20080623-index.html.   Here, too, several interested entities also submitted comments relevant to 19 C.F.R. § 351.414(f) (2007).   *See* Letter from Daniel L. Schneiderman, Counsel for Appleton Papers, Inc. and Bridgestone Americas Holding, Inc., to The Honorable David Spooner, Assistant Secretary for Import Administration, U.S. Department of Commerce (June 23, 2008), *available at* http://enforcement.trade.gov/download/targeted-dumping/comments-20080623/appleton-bridgestone-td-cmt-20080623.pdf (arguing that A-T should be applied to all sales if more than 20 percent of an importer's sales are

found to be targeted); Letter from David A. Hartquist, Executive Director, Committee to Support U.S. Trade Laws, to Secretary of Commerce, U.S. Department of Commerce (June 23, 2008), *available at* http://enforcement.trade.gov/download/targeted-dumping/comments-20080623/ csustl-td-cmt-20080623.pdf (arguing that A-T should be applied to all targeted sales); Letter from Kessiri Siripakorn, Minister (Commercial), Department of Foreign Trade, Ministry of Commerce of Thailand, to Mr. David M. Spooner, Assistant Secretary for Import Administration, U.S. Department of Commerce (June 6, 2008), *available at* http://enforcement.trade.gov/download/ targeted-dumping/comments-20080623/gov-thailand-td-cmt-20080623.pdf (seeking clarification as to whether A-T would be applied to all sales or only targeted sales); Letter from David A. Hartquist, Kelley Drye & Warren LLP, to Secretary of Commerce, U.S. Department of Commerce (June 23, 2008), *available at* http://enforcement.trade.gov/download/targeted-dumping/comments -20080623/kdw-td-cmt-20080623.pdf (arguing that A-T should be applied to all sales when 20 percent or more of sales are targeted); Letter from Katherine Lugar, SVP, Government Affairs, Retail Industry Leaders Association, to The Honorable David Spooner, Assistant Secretary for Import Administration, U.S. Department of Commerce (June 23, 2008), *available at* http://enforcement.trade.gov/download/targeted-dumping/comments-20080623/rila-td-cmt-2008 0623.pdf (arguing that A-T should not be applied to all sales); Letter from Terence P. Stewart, Stewart and Stewart, to The Honorable David Spooner, Assistant Secretary for Import Administration, U.S. Department of Commerce (June 23, 2008), *available at* http://enforcement. trade.gov/download/targeted-dumping/comments-20080623/stewart-stewart-td-cmt-20080623.pd f (arguing that A-T should be applied to all sales when 20 percent or more of sales are targeted); Letter from Jeffrey D. Gerrish, Counsel for United States Steel Corporation, to David Spooner,

Assistant Secretary for Import Administration, U.S. Department of Commerce (June 23, 2008),

*available at* http://enforcement.trade.gov/download/targeted-dumping/comments-20080623/

ussteel-td-cmt-20080623.pdf (arguing that A-T should be applied to all sales if more than 20

percent of an importer's sales are found to be targeted or where the extent of the targeting cannot

be determined).

Second, plaintiff submitted no comments in response to either of the two Comment

Requests and did not do so in response to the Department's invitation of post-promulgation

comments in the Withdrawal Notice itself.   That is, after the Withdrawal Notice was issued, the

Department solicited comments on the withdrawal.   Withdrawal Notice, 73 Fed. Reg. at 74,931

("Parties are invited to comment on the Department's withdrawal of the regulatory provisions

governing targeted dumping in antidumping duty investigations. . . . To be assured of

consideration, written comments must be received not later than January 9, 2009.").

While the Department's solicitation of comments after publication of a rule does not

necessarily cure noncompliance with the notice and comment requirement under the APA, a

party's failure to submit subsequent comment when given the chance to do so is evidence that it

would have had nothing to add had it been given the opportunity to comment in the first instance.

Moreover, even in its papers submitted in this action, plaintiff has failed to identify any argument

that it would have raised if the proper notice and comment procedures had been followed.   *See*

*Dean*, 604 F.3d at 1289 (Wilson, J. concurring) ("[L]egal authority supports the proposition that

[plaintiff] suffered no prejudice because he didn't show what comment he might have made on the

interim rule." (citing *Air Transp. Ass'n of Am. v. C.A.B.*, 732 F.2d 219, 224 n.11 (D.C. Cir. 1984)).

Consequently, even if the Department's withdrawal of 19 C.F.R. § 351.414(f) (2007) was

in violation of the APA's notice and comment requirement, that error was harmless as it relates to

the plaintiff in this case.   Accordingly, as part of its analysis on remand in this case, the Department need not adhere to the requirements of 19 C.F.R. § 351.414(f) (2007).   The Department, however, is free to limit the application of A-T to only the sales it identifies as targeted on remand, should it determine that such a limitation is appropriate.

### D. Deferred Issues

Plaintiff also argues that the Department was (1) required to consider whether there were alternate explanations for the alleged targeted dumping, (2) that the Department was not permitted to employ its zeroing methodology,[9] and (3) that the Department should have considered whether the number of dumped sales was too small to justify application of the targeted dumping remedy. Each of these issues may be rendered moot as a result of the Department's determinations on remand.   The Department has indicated that, "[s]ince the time of the underlying investigation in this case, [it] has continued to develop its methodology for examining the existence of masked dumping . . . ."   Def.'s Br. 18 n.4.   Should, for example, the Department employ this new methodology, and should it result in a finding that targeted dumping did not occur, the court's conclusions on each of these issues would be rendered advisory.

### CONCLUSION and ORDER

For the foregoing reasons, it is hereby

ORDERED that plaintiff's motion for judgment on the agency record is granted, in part, and Commerce's final determination is remanded; it is further

---

[9]     Although the court does not reach the issue here, it is worth noting that the Federal Circuit has "repeatedly addressed zeroing and has held 19 U.S.C. § 1677(35)(A) ambiguous and deferred to Commerce's reasonable interpretation of that statute."   *Union Steel*, 713 F.3d at 1104.

ORDERED that, on remand, Commerce shall issue a redetermination that complies in all respects with this Opinion and Order, is based on determinations that are supported by substantial record evidence, and is in all respects in accordance with law; it is further

ORDERED that, on remand, the Department may, in its discretion, choose to make a determination in accordance with its new targeted dumping methodology mentioned *supra* part II.D.; it is further

ORDERED that, should the Department continue to find that the application of the A-to-T methodology is appropriate, it must adequately explain why the standard methodologies cannot account for the pattern identified under 19 U.S.C. § 1677f-1(d)(1)(B)(i); it is further

ORDERED that the Department may, in its discretion, reopen the record to solicit any additional information it deems necessary to make its determinations; and it is further

ORDERED that the remand results shall be due on January 7, 2015; comments to the remand results shall be due thirty (30) days following filing of the remand results; and replies to such comments shall be due fifteen (15) days following filing of the comments.

IT IS SO ORDERED.

Dated:        September 9, 2014
              New York, New York

                                                        /s/ Richard K. Eaton
                                                        Richard K. Eaton