**Slip Op. 15-114**

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| BEIJING TIANHAI INDUSTRY CO., LTD., | : | |
| Plaintiff, | : | |
| v. | : | |
| UNITED STATES, | : | Before: Richard K. Eaton, Judge |
| Defendant, | : | Court No. 12-00203 |
| and | : | |
| NORRIS CYLINDER COMPANY, | : | |
| Defendant-Intervenor. | : | |

## OPINION and ORDER

[The Department of Commerce's Final Results of Redetermination are remanded.]

Dated: October <u>14</u>, 2015

*Mark E. Pardo*, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of Washington, DC, argued for plaintiff. With him on the brief was *Andrew T. Schutz*.

*Douglas G. Edelschick*, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant. With him on the brief were *Joyce R. Branda*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Franklin E. White, Jr.*, Assistant Director. Of counsel on the brief was *Michael T. Gagain*, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, United States Department of Commerce.

*Edward M. Lebow*, Haynes and Boone, LLP, of Washington, DC, argued for defendant-intervenor.

EATON, Judge: Before the court is plaintiff Beijing Tianhai Industry Co., Ltd.'s

("Tianhai" or "plaintiff") motion for judgment on the agency record, pursuant to USCIT Rule

56.2.  *See* Resp't's Mot. for J. on the Agency R. Pursuant to Rule 56.2 (ECF Dkt. No. 32).  In

*Beijing Tianhai Industry Co. v. United States*, 38 CIT __, 7 F. Supp. 3d 1318 (2014) ("*BTIC I*"),

the court remanded to the United States Department of Commerce ("Commerce" or the

"Department") its final determination in the antidumping duty investigation of high pressure

steel cylinders From the People's Republic of China ("PRC").  *See High Pressure Steel*

*Cylinders from the PRC*, 77 Fed. Reg. 26,739 (Dep't of Commerce May 7, 2012) (final

determination of sales at less than fair value), and accompanying Issues and Decision

Memorandum ("Issues & Dec. Mem.") (collectively, "Final Determination"); *see also High*

*Pressure Steel Cylinders From the PRC*, 77 Fed. Reg. 37,377 (Dep't of Commerce June 21,

2012) (antidumping duty order).  On remand, Commerce was directed to further explain the use

of the average-to-transaction ("A-T") methodology[1] for determining the presence of targeted

dumping and for calculating plaintiff's dumping margin.  *See BTIC I*, 38 CIT at __, 7 F. Supp. 3d

at 1337–38.  Commerce supplemented its explanation in its Final Results of Redetermination

Pursuant to Court Remand dated September 9, 2014.  *See* Final Results of Redetermination

Pursuant to Ct. Remand (ECF Dkt. No. 85) ("Remand Results").  Jurisdiction lies pursuant to 28

U.S.C. § 1581(c) (2012) and 19 U.S.C. § 1516a(a)(2)(B)(i) (2012).  For the reasons discussed

below, the Remand Results are remanded.

## BACKGROUND

In 2011, responding to a petition filed by defendant-intervenor Norris Cylinder Company

("Norris" or "defendant-intervenor") alleging targeted dumping, the Department initiated an

---

[1]     The A-T methodology "compar[es] the weighted average of the normal values to the export prices (or constructed export prices) of individual transactions" when making a less-than-fair-value determination.  *See* 19 U.S.C. § 1677f-1(d)(1)(B) (2006).

antidumping duty investigation of high pressure steel cylinders from the PRC ("subject

merchandise") and selected plaintiff, a producer and exporter of subject merchandise from the

PRC, as a mandatory respondent. *See High Pressure Steel Cylinders from the PRC*, 76 Fed. Reg.

33,213, 33,213 (Dep't of Commerce June 8, 2011) (initiation of antidumping duty investigation);

Final Determination, 77 Fed. Reg. at 26,739. The period of investigation was October 1, 2010

through March 31, 2011 ("POI"). Final Determination, 77 Fed. Reg. at 26,739.

During its investigation, Commerce found that the statute permitted the use of an

alternative methodology (i.e., A-T) to determine if targeted dumping had occurred, and to

calculate plaintiff's dumping margin. *See* Issues & Dec. Mem. at cmt. IV. The Department

issued its Preliminary Determination of sales at less than fair value on December 15, 2011. *See*

*High Pressure Steel Cylinders From the PRC*, 76 Fed. Reg. 77,964 (Dep't of Commerce Dec.

15, 2011) (preliminary determination of sales at less than fair value) ("Preliminary

Determination"). In its preliminary investigation, Commerce used the targeted dumping test that

has come to be known as the *Nails* test.[2] After applying the test, the Department determined that

there was "a pattern of prices for comparable merchandise that differ[ed] significantly by time

period." Preliminary Determination, 76 Fed. Reg. at 77,968.

---

[2]     "The *Nails* test derives its name from the cases in which it was first used."
*Timken Co. v. United States*, 38 CIT __, __ n.3, 968 F. Supp. 2d 1279, 1283 n.3 (2014) (citing
*Certain Steel Nails from the PRC*, 73 Fed. Reg. 33,977 (Dep't of Commerce June 16, 2008)
(final determination of sales at less than fair value and partial affirmative determination of
critical circumstances); *Certain Steel Nails from the United Arab Emirates*, 73 Fed. Reg. 33,985
(Dep't of Commerce June 16, 2008) (notice of final determination of sales at not less than fair
value)), *aff'd*, 589 F. App'x 995 (Fed. Cir. 2015). Although not relevant to this case, the
Department now applies the "Cohen's *d* test" and the "ratio test," rather than the *Nails* test to
determine whether targeted dumping has occurred. *See Steel Wire Garment Hangers From the
PRC*, 80 Fed. Reg. 41,480 (Dep't of Commerce July 15, 2015) (preliminary results of
antidumping duty administrative review; 2013–2014), and accompanying Issues and Decision
Memorandum at 13–14.

To preliminarily determine the presence of dumping and to calculate plaintiff's

antidumping duty rate, the Department used the A-T methodology because it found that its

normally used average-to-average ("A-A") methodology[3] could not properly account for the

differing pattern of sales prices.  *Id.*  When making its dumping determination, the Department

applied the A-T methodology, with zeroing,[4] to all of plaintiff's U.S. sales during the POI.  *See*

*id.*

In the Final Determination, the Department continued to use the *Nails* test and continued

to find that there was a pattern of sales that differed significantly by time period.[5]  Issues & Dec.

Mem. at cmt. IV.  Commerce again used the A-T methodology to determine if dumping had in

fact occurred and to calculate the antidumping rate.  *See id.*  The Department also continued to

apply its zeroing methodology to all of plaintiff's U.S. sales.  *See id.*  In the Final Determination,

the Department calculated a weighted-average dumping margin of 6.62% for Tianhai during the

POI.  Final Determination, 77 Fed. Reg. at 26,742.

Following issuance of the Final Determination, plaintiff moved for judgment on the

agency record pursuant to USCIT Rule 56.2.  In *BTIC I*, the court held that two of plaintiff's

---

[3]       The A-A methodology "compar[es] the weighted average of the normal values to
the weighted average of the export prices (and constructed export prices) for comparable
merchandise."  19 U.S.C. § 1677f-1(d)(1)(A)(i).

[4]       "Zeroing is a methodology used for calculating an exporter's weighted average
dumping margin 'where negative dumping margins (i.e., margins of sales of merchandise sold at
nondumped prices) are given a value of zero and only positive dumping margins (i.e., margins
for sales of merchandise sold at dumped prices) are aggregated.'"  *BTIC I*, 38 CIT at __ n.1, 7 F.
Supp. 3d at 1323 n.1 (quoting *Union Steel v. United States*, 713 F.3d 1101, 1104 (Fed. Cir.
2013)).

[5]       The Department made one adjustment to the dates of the sales within the
allegedly targeted period.  *See* Final Determination, 77 Fed. Reg. at 26,740.  That change is not
challenged here.

claims were wanting.  First, the court found that "plaintiff failed to exhaust its administrative remedy with respect to its 'pattern' argument,"[6] and, thus, declined to consider it.  *BTIC I*, 38 CIT at __, 7 F. Supp. 3d at 1331.  Next, with regard to the application of 19 C.F.R. § 351.414(f) (2007), which limited the application of the A-T method to targeted sales, and which plaintiff argued was improperly withdrawn, the court found that, even if Commerce erred in withdrawing the regulation, "that error [was] harmless as it applies to plaintiff, and the Department is not bound by the withdrawn regulation here."  *Id.* at __, 7 F. Supp. 3d at 1333.

The court also found insufficient Commerce's explanation for why the observed pricing pattern between the targeted and non-targeted time periods could not be accounted for using either of the general methodologies prescribed by statute, i.e., A-A or transaction-to-transaction ("T-T"), and thus, that the A-T methodology, an exception to the general methodologies, should be employed.  *See id.* at __, 7 F. Supp. 3d at 1331–32; *see also* 19 U.S.C. § 1677f-1(d)(1).  Because "[t]he Department's failure to provide an explanation sufficient to satisfy 19 U.S.C. § 1677f-1(d)(1)(B)(ii) was an error of law," the court found that "a remand for the Department to provide such explanation [was] required."  *Id.* at __, 7 F. Supp. 3d at 1332.  The court therefore granted plaintiff's USCIT Rule 56.2 motion, in part, and in remanding the case to the Department, (1) directed Commerce to further explain its selected methodology for calculating Tianhai's dumping margin and (2) reserved decision on the other issues that might be rendered moot if Commerce changed its methodology on remand.  *See id.* at __, 7 F. Supp. 3d at 1337–38.

---

[6]     Plaintiff's "pattern" argument was "that the legislative history and purpose of 19 U.S.C. § 1677f-1(d)(1)(B) show that the Department's application of the *Nails* test in this case was improper because the test can identify a pattern of targeted dumping based on non-dumped sales."  *BTIC I*, 38 CIT at __, 7 F. Supp. 3d at 1328–29.

**STANDARD OF REVIEW**

"The court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).  "The results of a redetermination pursuant to court remand are also reviewed for compliance with the court's remand order."  *Yantai Xinke Steel Structure Co. v. United States*, 38 CIT __, __, Slip Op. 14-38, at 4 (2014) (citation omitted) (internal quotation marks omitted).

**DISCUSSION**

I.    **LEGAL FRAMEWORK**

    **A.  Statutory Framework**

"[I]n 'situations where comparable merchandise differ[s] significantly among purchasers, regions, or periods of time,'" Commerce may determine if dumping has occurred by using the A-T methodology.  *See JBF RAK LLC v. United States*, 790 F.3d 1358, 1361 (Fed. Cir. 2015) (alteration in original) (quoting *U.S. Steel Corp. v. United States,* 621 F.3d 1351, 1359 (Fed. Cir. 2010)); *See* 19 U.S.C. § 1677f-1(d)(1).  During an antidumping investigation, the Department ordinarily determines whether dumping has occurred by using one of the two methodologies (i.e., A-A or T-T) identified in 19 U.S.C. § 1677f-1(d)(1)(A).  The general rule under the A-A methodology is that, when determining an exporter's dumping margin, the Department will "compar[e] the weighted average of the normal values to the weighted average of the export prices (and constructed export prices) for comparable merchandise" during the period of investigation.  *See* 19 U.S.C. § 1677f-1(d)(1)(A)(i).  If the difference between the weighted average normal values of an exporter's merchandise and the weighted average of the export

prices is a positive number, then dumping has occurred.  *See BTIC I,* 38 CIT at __, 7 F. Supp. 3d

at 1325.  Thus, 19 U.S.C. § 1677f-1(d)(1)(A)(i) provides for an A-A comparison to determine

whether dumping has occurred.

The Department is also permitted to determine whether dumping has occurred, and to set

an exporter's margin, by using the T-T methodology, by which it may "compar[e] the normal

values of individual transactions to the export prices . . . of individual transactions for

comparable merchandise."  19 U.S.C. § 1677f-1(d)(1)(A)(ii).  By regulation, however, this

methodology is permitted only in special circumstances.  *See* 19 C.F.R. § 351.414(c)(1) ("The

Secretary [of Commerce] will use the [T-T] method only in unusual situations, such as when

there are very few sales of subject merchandise and the merchandise sold in each market is

identical or very similar or is custom-made.").

In addition to the A-A and T-T methodologies, the statute provides for an exception to

the general methodologies, the A-T methodology, to be used to "determine whether the subject

merchandise is being sold in the United States at less than fair value," and, if so, to calculate a

dumping margin.  *See* 19 U.S.C. § 1677f-1(d)(1)(B).  When applying the A-T methodology,

Commerce "compar[es] the weighted average of the normal values to the export prices (or

constructed export prices) of individual transactions for comparable merchandise."  *Id.*  In

providing for the use of this alternate methodology, Congress recognized that there might be

situations where the usual "methodolog[ies] cannot account for a pattern of prices that differ

significantly among purchasers, regions, or time periods, *i.e.*, where targeted dumping may be

occurring."  Uruguay Round Agreements Act, Statement of Administrative Action ("SAA"),

H.R. Doc. No. 103-316, at 843 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4178.  Congress

anticipated that the patterns of sales might be identifiable on the basis of "purchasers, regions, or

time periods."[7]  SAA, H.R. Doc. No. 103-316, at 843, *reprinted in* 1994 U.S.C.C.A.N. at 4178.

Thus, the statute provides that the Department

> may determine whether the subject merchandise is being sold in the United States at less than fair value by comparing the weighted average of the normal values to the export prices (or constructed export prices) of individual transactions for comparable merchandise, if—
>     (i) there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time, and
>     (ii) the administering authority explains why such differences cannot be taken into account using [A-A or T-T].

19 U.S.C. § 1677f-1(d)(1)(B); *see also* SAA, H.R. Doc. No. 103-316, at 843, *reprinted in* 1994

U.S.C.C.A.N. at 4178 ("Before relying on this methodology, however, Commerce must establish

and provide an explanation why it cannot account for such differences through the use of [A-A]

or [T-T].").  In other words, before it may employ the A-T methodology, the statute requires the

Department to (1) identify a pattern of pricing that differs significantly among purchasers, and

then also (2) explain what about that particular pattern makes the use of A-A or T-T

inappropriate.  Once the Department finds that it has satisfied 19 U.S.C. § 1677f-1(d)(1)(B)(i)

and (ii), it may compare the weighted average of the normal values to each individual export (or

constructed export) price to determine an exporter's margin.  Thus, if both requirements of §

1677f-1(d)(1)(B) are met, the Department may use A-T to find that dumping has taken place and

determine the producer's or exporter's dumping margin.

---

[7]     In this case, Norris alleged targeting on the basis of time period.  *See* Preliminary Determination, 76 Fed. Reg. at 77,968.

## B.  The *Nails* Test

Here, before Commerce could take advantage of the exception provided in the statute and employ the A-T methodology it first had to conclude that there was a pattern of sales prices that differed significantly over time.  *See* 19 U.S.C. § 1677f-l(d)(1)(B)(i).  In this case, in order to meet the requirements of 19 U.S.C. § 1677f-1(d)(1)(B)(i), the Department engaged in a two-step analysis referred to as the *Nails* test.[8]  The *Nails* test proceeds in two steps, each performed on a product-specific basis by control number or "CONNUM."[9]  The first step is referred to as the "standard-deviation test."  *JBF RAK*, 790 F.3d at 1367 n.5.  In this step, if 33% or more of the alleged targeted group's (i.e., customer, region, or time period) "sales of subject merchandise (by sales volume) . . . are at prices more than one standard deviation below the weighted-average price of all sales under review," then those sales pass the standard deviation test and are considered in step two: the "gap test."  *Id.* (citation omitted) (internal quotation marks omitted).  When performing the gap test, Commerce considers whether the "gap" "between the weighted-average price of sales for [the] allegedly targeted group and the next highe[st] weighted-average price of sales to the non-targeted groups exceeds the average price gap (weighted by sales volume) for the non-targeted groups."  *Id.* (citation omitted) (internal quotation marks omitted).  In other words, if the gap between the targeted group and the next-highest non-targeted group is

---

[8]     The first stage of the two-step test is directed to the pattern requirement of 19 U.S.C. § 1677f-1(d)(1)(B)(i), while the second stage concerns the significant-difference requirement of that statutory provision.  *See* 19 U.S.C. § 1677f-1(d)(1)(B)(i); *see also JBF RAK*, 790 F.3d at 1367 n.5.

[9]     "Control numbers, or CONNUMs are used by Commerce to designate merchandise that is deemed identical based on the Department's model matching criteria. . . . CONNUMs are used as the basis for product identification in most cases."  *Shandong Huarong Mach. Co. v. United States*, 30 CIT 1269, 1284 n.12, 435 F. Supp. 2d 1261, 1275 n.12 (2006) (quoting *Koenig & Bauer-Albert AG v. United States*, 24 CIT 157, 161 n.6, 90 F. Supp. 2d 1284, 1288 n.6 (2000)) (internal quotation marks omitted).

greater than the average gap, those sales pass the gap test. "If more than 5% of total sales of the subject merchandise to the alleged target pass both tests, Commerce determines that targeting has occurred." *Timken*, 38 CIT at __, 968 F. Supp. 2d at 1283. This Court in *BTIC I* found the two steps of the *Nails* test to be a reasonable method for determining whether the requirements of 19 U.S.C. § 1677f-1(d)(1)(B)(i) have been met. *See BTIC I*, 38 CIT at __, 7 F. Supp. 3d at 1328.

## II.    REMAND RESULTS

Although Commerce adequately identified a pattern of sales that differed over time using the *Nails* test, in *BTIC I*, the court remanded the issue of the Department's selection of the A-T method for determining whether dumping was present and for calculating Tianhai's weighted-average dumping margin. *See BTIC I*, 38 CIT at __, 7 F. Supp. 3d at 1337–38. In doing so, the court found that Commerce had not explained adequately why the A-T methodology was appropriate because Commerce did not "mention . . . how the Department reached [its] conclusion" or "reference[] any record evidence supporting [its] conclusion." *Id.* at __, 7 F. Supp. 3d at 1331. Because the statute states that Commerce must "'explain[] why such differences cannot be taken into account' using A-A or T-T," the court directed Commerce to explain, on remand, why the A-A and T-T methodologies were inappropriate. *Id.* at __, 7 F. Supp. 3d at 1326 (quoting 19 U.S.C. § 1677f-1(d)(1)(B)(ii)).

The court, in *BTIC I*, further observed that:

> In creating an explanation requirement in 19 U.S.C. § 1677f-1(d)(1)(B)(ii), Congress anticipated that "pattern[s] of prices that differ significantly among purchasers, regions, or time periods," could sometimes be accounted for without resorting to A-T. Accordingly, Congress required the Department to explain why A-A and T-T cannot account for a pattern of disparate prices before using A-T. Thus, if no explanation other than the bare-bones invocation of the differing natures of the [A-A] and [A-T] methodologies would suffice to satisfy 19 U.S.C. § 1677f-1(d)(1)(B)(ii), as defendant and defendant-intervenor would have it, that statutory provision would be superfluous.

*Id.* at __, 7 F. Supp. 3d at 1332 (quoting SAA, H.R. Doc. No. 103-316, at 843, *reprinted in* 1994

U.S.C.C.A.N. at 4178 ("Before relying on this methodology, however, Commerce must establish

and provide an explanation why it cannot account for such differences through the use of an

average-to-average or transaction-to-transaction comparison.")).

Here, in the Remand Results, Commerce stated that it could not use the T-T method

because this determination involved a less-than-fair-value investigation in a nonmarket economy

country[10] "in which the Department used a factors of production method to determine normal

value," and normal value was "thus based . . . on the valuation of [Tianhai's] factors of

production using surrogate values rather than on home market or third country transactions."

Remand Results at 4–5. In other words, Commerce elaborated, "there simply is no

corresponding home market or third country sales database that would allow [the Department] to

compare [Tianhai's] individual home market or third country transactions to its individual U.S.

sales transactions." Remand Results at 5. Thus, no T-T comparison was possible. Because, as

Commerce points out, there were no usable transactions in the PRC to compare to domestic U.S.

transactions, the court finds the Department's explanation with respect to the T-T methodology

to be reasonable, and its explanation for not using T-T adequate. *See* 19 U.S.C. § 1677f-

1(d)(1)(B)(ii).

---

[10]     A "nonmarket economy country" is a "foreign country that the [Department] determines does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise." 19 U.S.C. § 1677(18)(A). "Because the Department deems the PRC 'to be a nonmarket economy country, Commerce generally considers information on sales in [the PRC] and financial information obtained from Chinese producers to be unreliable for determining, under 19 U.S.C. § 1677b(a), the normal value of the subject merchandise.'" *Jacobi Carbons AB v. United States*, 38 CIT __, __ n.11, 992 F. Supp. 2d 1360, 1365 n.11 (2014) (alteration in original) (quoting *Shanghai Foreign Trade Enters. Co. v. United States*, 28 CIT 480, 481, 318 F. Supp. 2d 1339, 1341 (2004)), *aff'd*, Appeal No. 2014-1752 (Fed. Cir. Aug. 3, 2015).

Next, Commerce found that the price differences, for purposes of the first step of the

*Nails* test, could not be determined using the A-A methodology. *See* Remand Results at 5–6.

When making this finding, Commerce stated:

> To satisfy the second part of the statutory test, *i.e.*, to explain why the differences cannot be taken into account using the [A-A] method, in the underlying investigation, we calculated the estimated weighted-average dumping margins using both the [A-A] method and the [A-T] method. In this specific case, we find that the price differences cannot be taken into account using the [A-A] method, as evidenced by the fact that [Tianhai's] estimated weighted-average dumping margin crossed the *de minimis* threshold specified in [19 U.S.C. § 1673b(b)(3)[11]] (*i.e.*, two percent *ad valorem*) when we applied the [A-T] method instead of the [A-A] method. In other words, [Tianhai's] estimated weighted-average dumping margin calculated using the [A-A] method was below the *de minimis* threshold, and [Tianhai's] estimated weighted-average dumping margin calculated using the [A-T] method was 6.62 percent. In light of [the] fact that the estimated weighted-average dumping margin crosses the *de minimis* threshold specified in [§ 1673b(b)(3)] when the [A-T], rather than the [A-A], comparison method is applied, the Department finds that the [A-A] method cannot account for the price differences.

Remand Results at 5–6 (footnotes omitted). Put another way, using the *Nails* test, Commerce

first found a difference in price pattern between the targeted and non-targeted time periods that

indicated that dumping had occurred during the targeted period. Next, Commerce applied the

A-A methodology, but that methodology did not yield a dumping margin that was sufficient in

magnitude to result in an antidumping order. When it applied the A-T methodology, however, a

larger margin was found. Because this larger margin exceeded the two-percent threshold,

provided by statute as necessary for the imposition of an antidumping order when a margin is

---

[11]     Pursuant to 19 U.S.C. § 1673b(b)(3):
        In making a determination under this subsection, the [Department] shall disregard any weighted average dumping margin that is de minimis. For purposes of the preceding sentence, a weighted average dumping margin is de minimis if [Commerce] determines that it is less than 2 percent ad valorem or the equivalent specific rate for the subject merchandise.
19 U.S.C. § 1673b(b)(3).

determined using A-A, Commerce concluded that the observed differences in price pattern did indeed indicate that targeted dumping had occurred, but was concealed using the A-A methodology.

With respect to this explanation, it is important to keep in mind how the *Nails* test fits into the analysis required by 19 U.S.C. § 1677f-1(d)(1)(B)(i). The *Nails* test does not demonstrate that targeted dumping has taken place. Rather, the test merely identifies "a pattern of [sales] prices that differ significantly among . . . time periods, *i.e.*, where targeted dumping may be occurring." *See* SAA, H.R. Doc. No. 103-316, at 843, *reprinted in* 1994 U.S.C.C.A.N. at 4178. Dumping in targeted dumping cases, as in all dumping cases, is determined by a comparison of normal value to export price. The question is which methodology (i.e., A-A, T-T, or A-T) is appropriate under the facts of each investigation. Should Commerce choose to use the A-T methodology, the statute requires the Department to explain why the two general methodologies could not be used. *See* 19 U.S.C. § 1677f-1(d)(1)(B)(ii) ("The [Department] may determine whether the subject merchandise is being sold in the United States at less than fair value by comparing the weighted average of the normal values to the export prices (or constructed export prices) of individual transactions for comparable merchandise, if . . . [Commerce] *explains* why such differences cannot be taken into account using [the A-A or T-T methods]." (emphasis added)).

On remand, Commerce has supplied what it claims is an adequate explanation for why A-T should be used here. Its reasoning, however, relies on a form of confirmation bias: Commerce's explanation is that, because substantial dumping was not found using A-A, but substantial dumping was found using A-T, it was permissible for the Department to use the alternative A-T methodology. *See* Remand Results at 5–6; *see also* Issues & Dec. Mem. at cmt.

IV. This statement, however, is simply inadequate. The statute requires that the Department

explain why A-A (or T-T) cannot take into account the pattern of pricing differences "among

purchasers, regions, or periods of time" before it may proceed to using the A-T methodology.

*See* 19 U.S.C. § 1677f-1(d)(1)(B). Here, Commerce states a fact when it says that it finds

substantial dumping using A-T and not when using A-A, but that fact alone does not explain why

A-A cannot account for the differences.[12] Rather, if this is an explanation at all, it explains that

Commerce chose to use the A-T methodology because it showed, not dumping, but a greater

level of dumping. Merely because the A-A methodology did not result in a significant dumping

margin and the A-T methodology did, however, it does not necessarily follow that the statute

permits the application of A-T to determine plaintiff's dumping margin.

It is plain from its structure, that the statute requires more than a finding of greater

dumping before the use of the A-T methodology is permitted. If, as the Department would have

the court believe, Congress intended that the only requirement before the A-T methodology

could be used was a finding of greater dumping using A-T itself, 19 U.S.C. § 1677f-

1(d)(1)(B)(ii)'s explanation requirement would be rendered effectively a nullity. Indeed, under

that reading, in every case where the Department wished to use the A-T methodology and was

able to identify dumping above the de minimis level using that exception methodology, it would

be permitted to do so regardless of whether the general A-A or T-T methodologies were more

---

[12]     It is worth noting that Commerce comes close to providing an explanation in its
reasons for the use of zeroing when employing the A-T methodology:

> This is so because record evidence shows that for [Tianhai], the [A-A]
> methodology masks differences in the patterns of prices between the targeted and
> non-targeted groups by averaging low-priced sales to the targeted group with
> high-priced sales to the non-targeted group. . . . As such, we find that the
> petitioner is correct that the intent of [19 U.S.C. § 1677f-1(d)(1)] is not
> effectuated if offsets are used under the alternative [A-T] methodology.

Issues & Dec. Mem. at cmt. IV.

appropriate, and without any further explanation as to why those methodologies were inadequate.

Here, the Department has chosen a narrative rather than an explanation. Because Commerce has failed to satisfy the requirements of the statute, this issue must be remanded for Commerce to supply the explanation required by 19 U.S.C. § 1677f-1(d)(1)(B)(ii).

## III.   DEFERRED ISSUES

As previously explained, in *BTIC I*, the court remanded the issue of the methodology used by the Department to determine whether dumping had occurred, and if so, to establish a dumping margin, but refrained from addressing plaintiff's three other arguments. Because the Federal Circuit has addressed one of the three arguments, and because the two others can be disposed of easily, they will be considered here.

### A.   Commerce Is Not Required to Consider Whether the Pattern Was Caused by a Valid Commercial Reason

Before the court, plaintiff argues that Commerce was required to consider whether there were alternate explanations for the alleged targeted dumping. *See* Pl.'s Mem. of Law in Supp. of Mot. for J. on the Agency R. Pursuant to Rule 56.2 26–29(ECF Dkt. No. 32) ("Pl.'s Br."). Plaintiff contends that (1) if the "pattern" of price differences was caused by a valid commercial reason (i.e., not dumping), then the A-T exception does not apply, and (2) in Tianhai's case, the pattern was, in fact, caused by a valid commercial reason, and not dumping. Pl.'s Br 29.

The Federal Circuit has recently addressed the issue of whether Commerce is required to consider alternate explanations for "a pattern of export prices . . . that differs significantly among . . . time periods," and has found that it is not. *See JBF RAK*, 790 F.3d at 1368 ("Section 1677f-1(d)(1)(B) does not require Commerce to determine the reasons why there is a pattern of export

prices for comparable merchandise that differs significantly among purchasers, regions, or time periods, nor does it mandate which comparison methods Commerce must use in administrative reviews. . . . [R]equiring Commerce to determine the intent of a targeted dumping respondent 'would create a tremendous burden on Commerce that is not required or suggested by the statute.'" (quoting *JBF RAK LLC v. United States*, 38 CIT __, __, 991 F. Supp. 2d 1343, 1355 (2014))); *see also Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 608 F. App'x 948, 949–50 (Fed. Cir. 2015) ("In light of our decision in *JBF RAK*, and because Borusan has merely challenged Commerce's failure to consider Borusan's alternate explanation for the observed pricing patterns, we affirm the Court of International Trade's judgment sustaining Commerce's calculation of a 3.55% dumping margin using the average-to-transaction comparison methodology."). Thus, because the Federal Circuit has found that Commerce is not required to consider alternate explanations for an observed pricing pattern, plaintiff's argument, that, here, the "pattern" of price differences was caused by a valid commercial reason (i.e., not dumping), necessarily fails.

### B. Commerce's Application of Zeroing Was Reasonable

Plaintiff also argues that, even if the use of the A-T methodology were appropriate, the Department was not permitted to employ its zeroing methodology. *See* Pl.'s Br. 29–35. According to plaintiff: (1) "the statute is ambiguous with respect to the application of the zeroing methodology"; (2) Commerce has an "established policy . . . that it will *not* apply zeroing in antidumping duty investigations"; and (3) because (1) and (2) are true, "Commerce must provide an independent justification for the application of its zeroing methodology." *See* Pl.'s Br. 30–31. Plaintiff thus maintains that Commerce cannot justify the application of zeroing simply because

the Department has selected the "exception" methodology (i.e., the A-T methodology).  Pl.'s Br.

31.

In *Union Steel v. United States*, the Federal Circuit affirmed Commerce's abandonment

of zeroing when using the A-A methodology with respect to investigations, but permitted the use

of zeroing in reviews employing the A-T methodology, holding that:

> The [World Trade Organization's ("WTO")[13]] decision was limited; it found that
> Commerce's use of zeroing methodology with respect to [A-A] comparisons in
> antidumping duty *investigations* was inconsistent with the United States'
> international obligations.  The Executive Branch responded by discontinuing its
> zeroing practice in new and pending investigations using [A-A] comparison
> methodology.  Commerce, did not, however, alter its practice with respect to the
> use of zeroing methodology in anything other than investigations using [A-A]
> comparisons. . . . Commerce's modification was limited to changes that were
> necessary to comply with the WTO decision.

*Union Steel v. United States*, 713 F.3d 1101, 1110 (Fed. Cir. 2013) (citations omitted).  In other

words, the Department did not abandon zeroing in A-A investigations after concluding that

zeroing led to an unfair result, or provided an inaccurate result, but rather, because it was obliged

to do so by our trading partners.  *See id.*

The *Union Steel* Court also found that

> Commerce's decision to use or not use the zeroing methodology reasonably
> reflects unique goals in differing comparison methodologies.  In average-to-
> average comparisons, as used in investigations, Commerce examines average
> export prices; zeroing is not necessary because high prices offset low prices
> within each averaging group.  When examining individual export transactions,
> using the average-to-transaction comparison methodology, prices are not
> averaged and zeroing reveals masked dumping.  This ensures the amount of
> antidumping duties assessed better reflect the results of each average-to-
> transaction comparison.  Commerce's differing interpretation is reasonable
> because the comparison methodologies compute dumping margins in different
> ways and are used for different reasons.

---

[13]        The WTO found that zeroing in antidumping investigations was a violation of
trade agreements entered into by the United States. *See Union Steel v. United States*, 713 F.3d
1101, 1105 (Fed. Cir. 2013) (citation omitted).

*Id.* at 1109 (footnote omitted).  Therefore, the Federal Circuit has found zeroing to be reasonable in at least some A-T situations.  Plaintiff acknowledges these findings of the Federal Circuit in *Union Steel*, yet maintains that the case did not establish that Commerce was entitled to use zeroing whenever the A-T method is employed.  *See* Pl.'s Reply Br. 14 (ECF Dkt. No. 50) ("Pl.'s Reply Br.").  Rather, plaintiff maintains that "the proper focus of the inquiry into whether zeroing is appropriate should be the type of proceeding and purpose it serves as opposed to the sales comparison method being employed."  Pl.'s Reply Br. 14.  Put another way, for plaintiff, the *Union Steel* Court did not necessarily hold that zeroing could be used in A-T comparisons in targeted dumping investigations as well as in reviews.

The court cannot agree.  As the court noted in *BTIC I*, "the Federal Circuit has 'repeatedly addressed zeroing and has held 19 U.S.C. § 1677(35)(A) ambiguous and deferred to Commerce's reasonable interpretation of that statute.'"  *BTIC I*, 38 CIT at __ n.9, 7 F. Supp. 3d at 1337 n.9 (quoting *Union Steel*, 713 F.3d at 1104).  Indeed, before the WTO intervened, the Federal Circuit found the use of zeroing lawful in both investigations and reviews.  *See Corus Staal BV v. Dep't of Commerce*, 395 F.3d 1343, 1347 (Fed. Cir. 2005).

In the Final Determination, Commerce provided the following explanation for its application of zeroing here:

> Our interpretation [that 19 U.S.C. § 1677(35)] permits zeroing in the [A-T] methodology, as in this investigation, and permits offsetting in the [A-A] methodology reasonably accounts for differences inherent in the distinct comparison methodologies.
>         . . . .
> . . . As such, we find that the petitioner is correct that the intent of [19 U.S.C. § 1677f-1(d)(1)] is not effectuated if offsets are used under the alternative [A-T] methodology.  This is so because record evidence shows that for [Tianhai], the [A-A] methodology masks differences in the patterns of prices between the targeted and non-targeted groups by averaging low-priced sales to the targeted group with high-priced sales to the non-targeted group.

Issues & Dec. Mem. at cmt. IV. This explanation comports with the Federal Circuit's holding in

*Union Steel*. *See Union Steel*, 713 F.3d at 1107 ("Commerce's decision to modify its zeroing

practice has previously been sustained by this court. In *U.S. Steel*, the court sustained

Commerce's decision to cease zeroing when making average-to-average comparisons in

antidumping duty investigations while recognizing Commerce intended to continue zeroing in

other circumstances. The court relied upon the differences among various types of comparison

methodologies, recognizing that 19 U.S.C. § 1677f-1(d)(1) allows Commerce to use average-to-

transaction comparisons in investigations where certain patterns of significant price differences

exist." (citing *U.S. Steel Corp. v. United States*, 621 F.3d 1351, 1355 n.2, 1362–63 (Fed. Cir.

2010))). The Federal Circuit has observed that "[n]o rule of law precludes Commerce from

interpreting 19 U.S.C. § 1677(35) differently in different circumstances as long as it provides an

adequate explanation." *Id.* at 1110.

> In [A-A] comparisons, as used in investigations, Commerce examines average export prices; zeroing is not necessary because high prices offset low prices within each averaging group. When examining individual export transactions, using the [A-T] comparison methodology, prices are not averaged and zeroing reveals masked dumping. This ensures the amount of antidumping duties assessed better reflect the results of each [A-T] comparison.

*Id.* at 1109. This explanation also fits to the facts of this case.

Therefore, for the foregoing reasons, plaintiff's arguments regarding zeroing are

unconvincing and the court finds that Commerce's application of zeroing was reasonable in this

case.

**C. Commerce's Application of the A-T Methodology Was Reasonable Despite the Small Number of Tianhai's Targeted Sales**

Last, Tianhai asks the court to consider the issue of "whether it was reasonable for Commerce to apply its targeted dumping remedy to 100%[14] of [Tianhai's] reported sales database when only 5.04% of [Tianhai's] sales were identified as being targeted." *See* Comments on Final Remand Redetermination 2 (ECF Dkt. No. 87); Pl.'s Br. 18–26. Specifically, plaintiff argues that the Department should have considered whether the number of dumped sales was too small to justify application of the targeted dumping margin to all of its sales. According to plaintiff, "[i]t is illogical and arbitrary for Commerce to attempt to satisfy the statutory requirements for use of the targeted dumping exception by reference to a small subset of [Tianhai's] sales data and then claim that it is justified in applying the targeted dumping methodology to 100% of [Tianhai's] sales database." Pl.'s Reply Br. 6. For plaintiff, because "only . . . 10 transactions . . . passed both prongs of Commerce's targeted dumping test, and these transactions comprise only 5.04% of [Tianhai's] sales database by quantity (of which only three transaction[s] comprising just 1.23% of the database were sales below fair value)," it was unreasonable for Commerce to apply its targeted dumping remedy to all of Tianhai's reported sales. *See* Pl.'s Reply Br. 6.

The *Chevron* line of cases provides guidance to courts when a statute is silent or ambiguous. *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). "[A]gencies are entitled to formulate policy and make rules 'to fill any gap left, implicitly or

---

[14]        As to whether Commerce was justified in applying the targeted dumping remedy to *all* of Tianhai's sales, rather than only to its "dumped" sales, this was also addressed, in part, in *BTIC I*. There, the court found that, even if Commerce erred in withdrawing a regulation that limited the application of the A-T method to targeted sales, "that error [was] harmless as it applies to plaintiff, and the Department is not bound by the withdrawn regulation here." *BTIC I*, 38 CIT at __, 7 F. Supp. 3d at 1333.

explicitly, by Congress.'" *SKF USA Inc. v. United States*, 254 F.3d 1022, 1030 (Fed. Cir. 2001) (quoting *Chevron*, 467 U.S. at 843). Relying on these cases, and because of the gap in the targeted dumping provision left by Congress, this Court has held that the Department's policies filling that gap are entitled to deference so long as they are reasonable. *See Timken Co. v. United States*, 38 CIT __, __ n.7, 968 F. Supp. 2d 1279, 1286 n.7 (2014), *aff'd*, 589 F. App'x 995 (Fed. Cir. 2015).

Here, although plaintiff's "fairness" argument may have some surface appeal, it cannot be said that Commerce's determination was unreasonable. Both the statute and the legislative history of 19 U.S.C. § 1677f-1 are "silent as to the body of sales to which Commerce will apply the exception methodology." *Chang Chun Petrochemical Co. v. United States*, 37 CIT __, __, 906 F. Supp. 2d 1369, 1375 (2013). That is, the statute gives no indication as to whether the margin determined by the exception A-T methodology should be applied to all of a respondent's subject merchandise following an investigation, or only to part. *See* 19 U.S.C. § 1677f-1(d)(1)(B). With respect to margins determined by the other methodologies in investigations where a producer or exporter is found to have dumped subject merchandise, the degree of dumping found in the dumping margin becomes the antidumping duty rate, which in turn becomes the cash deposit rate for all of the merchandise entered during the period of investigation. *See* 19 C.F.R. § 351.212. At no point in § 1677f-1(d)(1)(B) is there any indication that, unlike margins determined by these other methodologies, a margin determined by A-T should be restricted only to the merchandise entered during the time period of targeted dumping. Therefore, because the statute is silent as to whether a margin determined by the A-T methodology should be employed in a manner different from one determined in accordance with

§ 1677f-1(d)(1)(A), there is nothing to indicate that it is unreasonable to apply the resulting

margin to all of defendant's sales.

Because Commerce is entitled to deference with respect to its interpretation of how

broadly the margin will be applied, the Department may apply the rate to all of plaintiff's sales if

it is reasonable to do so. *See Chevron*, 467 U.S. at 843–44. Plaintiff cites to nothing in the

statute indicating that Congress intended a different result when the A-T methodology is used to

determine a dumping margin, rather than when A-A or T-T comparisons are used; that is, that the

resulting margin should be applied to all sales. *See Touche Ross & Co. v. Redington*, 442 U.S.

560, 571 (1979). Accordingly, plaintiff has not shown that the application of the resulting rate to

all of its sales was unreasonable. *See Chevron*, 467 U.S. at 843–44. It is worth noting, however,

that if Commerce chose to do so, it might well be able to provide a reasonable justification for

applying margins resulting from the use of the A-T methodology to only a portion of a

respondent's sales following an investigation.

Thus, although it remains to be seen if Commerce can provide an adequate explanation

for using the A-T methodology in this case, should it do so, its authority to apply the resulting

margin to all of plaintiff's sales is not in doubt.


**CONCLUSION and ORDER**

For the foregoing reasons, it is hereby

ORDERED that Commerce's Final Results of Redetermination are remanded; it is further

ORDERED that, on remand, Commerce shall issue a redetermination that complies in all

respects with this Opinion and Order, is based on determinations that are supported by

substantial record evidence, and is in all respects in accordance with law; it is further

ORDERED that, on remand, should the Department continue to find the application of the A-T methodology to be appropriate, it must provide an adequate explanation, in accordance with 19 U.S.C. § 1677f-1(d)(1)(B)(ii), as to why the general methodologies (i.e., the A-A and T-T methodologies) cannot account for the pattern identified under § 1677f-1(d)(1)(B)(i); it is further

ORDERED that the Department may, in its discretion, reopen the record to solicit any additional information it deems necessary to make its determinations; and it is further

ORDERED that the remand results shall be due on December 14, 2015; comments to the remand results shall be due thirty (30) days following filing of the remand results; and replies to such comments shall be due fifteen (15) days following filing of the comments.

Dated:          October 14, 2015
                New York, New York


                                              /s/ Richard K. Eaton
                                              Richard K. Eaton